563 So.2d 1273 (1990)
Francis Walter LUNDIN
v.
Gabrielle Howell LUNDIN.
No. 90 CA 0087.
Court of Appeal of Louisiana, First Circuit.
June 26, 1990.
R. Loren Kleinpeter, Baton Rouge, for plaintiff-appellant Francis W. Lundin.
Glenn R. Ducote and Charles Yeager, Baton Rouge, for defendant-appellee Gabrielle H. Lundin.
Before LOTTINGER, CRAIN and DOHERTY, JJ.
CRAIN, Judge.
The Lundins were married on July 26, 1980, and are residents of the Parish of East Baton Rouge. Mrs. Lundin vacated the family home on February 28, 1987. Thereafter, Mr. Lundin filed a petition for separation which was subsequently amended to a petition for divorce. At trial, both parties sought sole custody of Sean, a minor child born of marriage, who was approximately two years old at the time of trial.
A divorce was granted on the grounds of the adultery of both parties. Sole custody of the child was granted to Mrs. Lundin with visitation rights to Mr. Lundin.
From this judgment Mr. Lundin appeals. The sole assignment of error is that the trial court erred in granting sole custody of the child to Mrs. Lundin.
In written reasons for judgment the trial court found that although both parties love and can adequately care for the child, Mr. Lundin's actions and language regarding Mrs. Lundin in the presence of Sean was a bar to effective communication between the parties. The trial court further found that the testimony of both expert witnesses indicated it was in the best interests of the child that Sean be placed in the custody of his mother.
The best interest of the minor child is the paramount consideration where the custody of the minor child is claimed by both husband and wife. La.C.C. arts. 157 and 146(A). The award of joint custody is preferred where such an award is in the best interest of the child. La.C.C. art. 146(A). There is a rebuttable presumption that *1274 joint custody is in the best interest of the child. La.C.C. art. 146(C). Among the factors to be considered pursuant to La. C.C. art. 146(C)(2) in determining whether joint custody is in the best interest of the child are:
(a) The love, affection, and other emotional ties existing between the parties involved and the child.
(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his religion or creed, if any.
(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care, and other material needs.
(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.
(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(f)The moral fitness of the parties involved.
(g) The mental and physical health of the parties involved.
(h) The home, school, and community record of the child.
(i) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(j) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent.
(k) The distance between the respective residences of the parties.
(l) Any other factor considered by the court to be relevant to a particular child custody dispute. However, the classification of persons according to race is neither relevant nor permissible.
For approximately one year prior to their separation the Lundins were friends with Deborah Fuller and Katherine Cagnon, who lived nearby. At the time the friendship commenced Ms. Fuller and Ms. Cagnon lived together and were involved in an eight year lesbian relationship. On February 17, 1987, Mrs. Lundin told her husband that she was in love with Debbie Fuller and that she intended to leave Mr. Lundin in order to pursue her relationship with Ms. Fuller. She further told him that she would not hide her relationship with Ms. Fuller from Sean. During the trial Mrs. Lundin initially denied being sexually involved with Ms. Fuller. Subsequently, towards the end of trial, both she and Ms. Fuller took the witness stand again and confessed that they had earlier perjured themselves, allegedly on the advice of former counsel. Mrs. Lundin stated that she lied about her sexual relationship because she was afraid it would imperil her chances of obtaining custody of Sean; afraid of not being allowed to see him and afraid of criminal prosecution for homosexual acts. She stated "I was going to do whatever it took to get my son."
Mrs. Lundin moved out of the family residence on February 28, 1987, and moved with Sean into the home of Mrs. Lundin's parents. Two weeks later she and Sean moved into Ms. Fuller's three bedroom home. Ms. Cagnon occupied one bedroom, Sean another and Ms. Lundin slept with Ms. Fuller in Ms. Fuller's bed or sometimes on the den sofa. She stated that while living with Ms. Fuller she and Ms. Fuller would go into Ms. Fuller's bedroom and stay up talking but did not engage in sexual relations while Sean was in the house. She moved out of Ms. Fuller's house and returned to live with her parents on advice of counsel after Mr. Lundin initiated an action for separation. She moved into her own apartment two weeks prior to trial.
At Mr. Lundin's request he and Mrs. Lundin attended joint counseling sessions on February 27 and March 2, 1987 with Dr. Laura L'Herisson, a psychologist. Dr. L'Herisson testified that Mrs. Lundin questioned whether it would be appropriate to *1275 raise Sean in a household with an open lesbian relationship. Dr. L'Herisson responded that Mrs. Lundin's sexual orientation was not the key factor. In Dr. L'Herisson's opinion, an open lesbian relationship could be "in the child's worst interest." Dr. L'Herisson was queried:
Q. Do you recall when this discussion came up whether Mrs. Lundin made any specific statements about her intent to make this relationship open or keep it hidden?
A. She had questions regarding why it should be kept hidden, or disguised. And I had concerns about making it open; it being an open affectionate sexual relationship.
Q. Did you have an impression from the statement she made to you with the questions she had as to whether she intended this to be open or not? Can you state such an impression?
. . . .
A. But it was my understanding that it surfaced for that reason, and that her belief was that as long as it was a loving relationship that it would be all right for the child. My opinion was that it need to be more clandestine and undercover for the sake of the child. So we were in disagreement. I mean, it was not an adamant disagreement. I was there as a source of information.
Q. Correct me if I am wrong, but as I understand the statement you made in response to a few questions back, the relationship itself did not necessarily bother you so long as it was kept from open exposure to the child, would that be correct?
A. That was a much bigger concern, yes.
Q. Is that still a concern to you in a situation such as this?
A. Yes, that would always be a concern.
Q. Would you have the same concerns in a heterosexual relationship among nonmarried parties with a minor child?
A. Yes, I would. It's far preferable for the child to be in a stable and consistent relationship. So when a couple splits it's preferable if either are dating someone that they don't introduce that child to overnight company periodically, et cetera, unless they know that relationship is a committed long-term relationship. The attachment and severing of relationships for children can be very traumatic. So when they attach to one of a series of people it can be detrimental.
Q. Dr. L'Herisson, I will ask you to assume that you have a situation with a two year old son whose parents recently separated and is residing with his mother. And further assuming his mother is occupying a bedroom with another woman behind a closed door, would that situation create any problems in your professional opinion that might be harmful to the welfare of that two year old child?
A. A two year old child is at a stage of development where they are forming a gender identity and learning sex appropriate roles for their own sex, whatever, masculine and female rolls. [sic] It's preferable that they have good roll (sic) models in a stable environment always. I would be concerned if the role models were confused so that a child would not understand or know that this was not typical or usual or to be expected.
. . . .
Q. I'll ask you in a situation where you have a two year old son whose mother has expressed that she is engaging in a lesbian relationship, what type of activities would you be concerned that the two year old might *1276 be exposed to and you would want to shield the two year old from?
A. We want to shield the two year old from sexual activity, from scenes or noises related to lovemaking, from too passionate displays of affection, or from vocabulary or other things that a child normally would not be exposed to at that age.
Q. What would you consider passionate displays?
A. French kissing, fondling, passionate embraces, kisses, whatever.
Q. Did you counsel Mrs. Lundin that she should refrain from exposing, or possibly exposing her child to any sort of lesbian relationships?
A. Yes.
Q. And if such a relationship was still in existence, would that still be your counsel, that there (sic) son should be shielded from that activity?
A. From the homosexual activity, yes.
Q. Did she make any response to that counsel?
A. At the end of the second session she had decided she might be more comfortable seeking a second opinion, so I made some referrals.
Mrs. Lundin discontinued the sessions. Mr. Lundin continued counseling twice a month to the time of trial.
Dr. Joseph R. Manson, a child and adolescent psychiatrist, testified by deposition on behalf of Mrs. Lundin. He interviewed Mrs. Lundin on one occasion for purposes of psychological evaluation, scheduled psychological tests and reviewed the results of those tests. The psychological tests indicated that Mrs. Lundin has a narcissistic personality disorder. Dr. Manson stated, "[a]s far as Mrs. Lundin was concerned, I saw no reason on the basis of her diagnosis of narcissistic personality disorder nor the fact that she was in a lesbian relationship as a reason not to grant hernot for her to keep custody of her child." He clarified this statement by explaining that he was basing this opinion on facts related to him by Mrs. Lundin: she was not living with her paramour; no inappropriate displays of affection and no sexual encounters took place while Sean was present in the home. Dr. Manson would have preferred evaluating Sean and Mr. Lundin before giving an opinion but did not have sufficient time to do so. He further stated that Sean's witnessing of explicit sexual acts between Mrs. Lundin and her lover would be harmful to Sean.
Mr. Lundin admitted that Sean had previously witnessed affectionate displays between her and Ms. Fuller. One of Sean's two year old playmates also witnessed an overt display of affection between Mrs. Lundin and Ms. Fuller. On one occasion while living with Ms. Fuller, Mrs. Lundin babysat for the two year old child of Mrs. Fannie Purgatorio, a friend of the Lundins. Thereafter, Mrs. Purgatorio questioned Mrs. Lundin regarding a kiss between Ms. Fuller and Mrs. Lundin which the child witnessed. Mrs. Lundin acknowledged to Mrs. Purgatorio that the incident took place, but said it was an innocent kiss and apologized to Mrs. Purgatorio for the incident.
Mrs. Lundin acknowledged that although she and Ms. Fuller no longer lived together, her sexual relationship with Ms. Fuller continued to the time of trial. However, she stated that if required to choose between the two, she would give up her lesbian relationship if need be in order to obtain custody of her son. Although she would personally prefer an open relationship with Ms. Fuller, Mrs. Lundin stated that the only reason why she does not want her relationship with Ms. Fuller to be publicized is to protect Sean and shield him from ridicule.
Mr. Lundin admitted to having sexual relations, on two or three occasions with Ms. Cagnon. These encounters took place after Mrs. Lundin told him of her relationship with Ms. Fuller. Sean was sleeping in the home when at least one of the sexual encounters took place.
*1277 Mrs. Lundin stated that both she and Mr. Lundin have made disparaging comments to and about each other but it was mostly Mr. Lundin who initiated the confrontations. She admitted to saying that if Mr. Lundin pursued obtaining custody she was going to make Sean hate his father. However, she says she didn't really mean it.
Neither Mr. nor Mrs. Lundin dispute the fact that they both love their son. The evidence is overwhelming that Mr. Lundin is a good father. The record also reflects that he reacted badly to learning of his wife's relationship with Ms. Fuller and to the fact that she chose to leave him to pursue her relationship with Ms. Fuller. He was bitter, angry, afraid of what his son was being exposed to and afraid of emotional damage, if any, which would be inflicted on his son as a result of Mrs. Lundin's new chosen lifestyle. Dr. L'Herisson characterized his behavior as a rage reaction which was not an uncommon reaction to a person in his situation.
It is hoped that for the sake of their son both parents would refrain from verbal confrontations especially in the presence of Sean and desist from making disparaging comments about each other to Sean. Actions of this type by either parent would most probably be construed as not promoting and fostering the best interests of their child.
The trial court apparently applied the "reformation rule" and determined that Mrs. Lundin did not live with her paramour; was sincere in her resolve to shield her son from overt displays of affection and sexual activity; was sincere in her resolve to refrain from engaging in sexual activity while her son was at home; and was sincere in her resolve to conduct her relationship with her paramour in such manner that it would not be considered open and notorious in order that Sean would not be subject to ridicule, embarrassment or confusion. See Hicks v. Hicks, 488 So.2d 280 (La.App. 3d Cir.1986).
The decision of the trial court in child custody matters is entitled to great weight and should not be set aside absent an abuse of discretion. Waits v. Waits, 556 So.2d 215 (La.App. 2d Cir.1990).
We have considered the factors enumerated in La.C.C. art. 146(C)(2) especially the love, affection and emotional ties between the child and his parents [(C)(2)(a)]; the capacity and disposition of the parents to give love, affection and guidance to the child [(C)(2)(b)]; the moral fitness of the parents [(C)(2)(f)]; and the parents' willingness to foster a close continuing relationship between the child and the other parent [(C)(2)(j)]. After considering the above factors and the legislative preference for joint custody we find that the trial judge clearly abused her discretion in awarding sole custody of the child to Mrs. Lundin. An evaluation of the above factors does not rebut the presumption that joint custody is not in the best interest of this child. Both parents live in close proximity to each other, work regular hours, and can arrange for adequate child care when working. Consequently, the parents should be granted joint custody of the child. The mere fact of homosexuality may not require a determination of moral unfitness so as to deprive the homosexual parent of joint custody. However, in this case where the sexual preference is known and openly admitted, where there have been open, indiscreet displays of affection beyond mere friendship and where the child is of an age where gender identity is being formed, the joint custody arrangement should award greater custodial time to the father.
The matter is remanded to the trial court for formulation of a joint custody plan in accordance with this opinion. That plan is subject to appeal by either party once formulated and made a judgment of the trial court. All costs to be paid by appellee.
REVERSED AND REMANDED.