665 So.2d 760 (1995)
Robin SCOTT nee Rowan
v.
James Matthew SCOTT.
No. 95 CA 0816.
Court of Appeal of Louisiana, First Circuit.
December 15, 1995.
Writ Denied February 2, 1996.
*762 Rhonda B. Covington, Richard P. Bullock, Baton Rouge, for Appellant, Robin Scott nee Rowan.
Jeffrey S. Wittenbrink, Baton Rouge, for Appellee, James Matthew Scott.
Before LOTTINGER, C.J., and GONZALES and FITZSIMMONS, JJ.
GONZALES, Judge.
Following a hearing on the father's motion for change of custody, the trial court maintained the joint custody arrangement, but designated the father as the domiciliary parent of the two minor children. From this judgment, the mother now appeals.

FACTS
Appellant Robin Scott (nee Rowan), (hereinafter "Robin") and appellee James Matthew Scott (hereinafter "Jim") were married on July 24, 1982 in Brighton, Ontario, Canada. Approximately six weeks after their marriage, the couple moved to West Feliciana Parish. In September, 1982, Robin met Karri Martin (hereinafter "Karri") while attending Bible study classes in St. Francisville, Louisiana.
Robin and Jim's eldest child, James Matthew Scott, II, (hereinafter Jimmy) was born in 1984. Around this time, Robin developed a deeper friendship with Karri. In 1987, Robin and Jim had a second child, Andrew Rowan Scott (hereinafter Andrew).
As Karri and her husband were experiencing difficulty in conceiving a child of their own, Robin and Jim elected to conceive a third child in 1989, Anna Beth, who was adopted at birth by Karri and her husband. Jim testified that at about this point, he became suspicious and began to feel threatened by his wife's close friendship with Karri. Robin contends that while she and Karri had "expressed" their love for each other, their relationship at this point remained nonsexual. Shortly thereafter, Karri and her husband moved with Anna Beth to Africa.
Robin and Jim separated on December 26, 1991, and Robin filed for divorce on January 7, 1992. A joint custody agreement designating Robin as the primary custodial parent was signed by the parties on that date and attached to and made a part of this petition. Thereafter, Robin and the boys went to live near her parents in Canada.
At some point, Karri and her husband presumably divorced, and she returned to live in Baton Rouge. In March of 1993, Robin advised Jim that she was planning to move back to Louisiana to live with Karri. Jim testified that he made it clear that if this happened, he would seek custody of his sons. Robin, accompanied by Jimmy and Andrew, moved to Baton Rouge in July of 1993 where they initially lived with Karri in her apartment. Later, in September of 1993, Karri and Robin purchased a home together in Baton Rouge.
On December 16, 1993, Jim filed a rule to change custody. Following a hearing, the trial judge found that Robin's decision to cohabitate with Karri precipitated the present action and that joint custody with Jim as the primary custodial parent was in the best interest of the minor children, Jimmy and Andrew. The trial judge further granted a final divorce between the parties. Following *763 a denial of her request for a new trial, Robin has appealed.

ASSIGNMENT OF ERRORS
On appeal, Robin asserts that (1) Jim failed to establish that a change in custody was in the best interests of the children; (2) the trial court erred in relieving her as the stipulated domiciliary parent based upon her sexual orientation; (3) the trial court erred in relieving her as the stipulated domiciliary parent on account of a provision in the joint custody agreement which was breached by both parents; (4) the trial court erred in failing to appoint a mental health professional as requested; and (5) the trial court erred by denying her motion for a new trial.

DISCUSSION
In her first assignment of error, Robin contends that Jim failed to establish that a change in custody was in the best interest of the minor children, Jimmy and Andrew.
When a trial court has made a considered decree of permanent custody, the party seeking a change in custody bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child. Bergeron v. Bergeron, 492 So.2d 1193, 1200 (La.1986). A considered decree is one for which the court has received evidence regarding parental fitness to exercise child custody. Where the original custody was entered by stipulation of the parties, it is not a considered decree. Ledford v. Ledford, 94-0877, p. 5 (La.App. 1st Cir. 12/22/94); 648 So.2d 1060, 1062, writ denied, 95-0223 (La. 3/17/95); 651 So.2d 278.
In those cases such as this where no considered decree of custody has been rendered, the "heavy burden" rule does not apply. Connelly v. Connelly, 94-0527, p. 4 (La.App. 1st Cir. 10/7/94); 644 So.2d 789, 793. A party seeking to modify an existing custody arrangement must still prove that a change in circumstances materially affecting the welfare of the child has occurred since the original decree and that the modification proposed is in the best interests of the child. Ledford, 648 So.2d at 1063; Connelly, 644 So.2d at 793. Every child custody case must be viewed within its own peculiar set of facts. Id. at 793. A trial court's determination of custody is entitled to great weight and will be overturned on appeal only when there is a clear abuse of discretion. Thompson v. Thompson, 532 So.2d 101, 101 (La.1988); Blackledge v. Blackledge, 94-1568, p. 4 (La. App. 1st Cir. 3/3/95); 652 So.2d 593, 595.
Louisiana Civil Code article 134 sets forth a list of twelve factors which may guide a court in making the fundamental finding as to what disposition is in the best interest of the child. The present language of this article was enacted pursuant to § 1 of Acts 1993, No. 261; however, § 8 of this Act also enacted La.R.S. 9:387 which restricts application of the Act to those actions commenced after January 1, 1994. Because this action was commenced prior to that date, the prior law must be applied. Under the former provisions of La.Civ.Code art. 131(C)(2) (1992), the listed factors were to be considered by the court in determining whether the evidentiary presumption in favor of joint custody had been rebutted. As Jim is not seeking sole custody, the factors are inapplicable to the present proceeding.
In the instant case, Robin and Jim initially agreed, as part of the joint custody agreement, that Robin would be the primary custodial parent. Accordingly, to prevail on his rule to change custody, Jim was required to prove that a change of circumstances had occurred which materially affected the welfare of the minor children, Jimmy and Andrew, and that the modification proposed by him was in their best interest.
At the hearing in this matter, Jim testified that when he signed the consent agreement which designated Robin as the custodial parent of the children, he merely suspected that Robin might possess homosexual feelings for Karri. But at that time, Karri was moving to Africa with her husband and child, while Robin and the boys were moving to Canada. As a precaution, stipulations were inserted into the agreement which prohibited either *764 parent from engaging in sexual activity, sharing a room with any overnight guests, or living unmarried with any person while the children were present in the home. Additionally, neither parent could take the children overseas until they had attained the age of fifteen years or older.
Jim stated that Robin had always been a good mother to the boys, and he believed that even if his suspicions of her homosexuality were ultimately confirmed, Robin's moral code would never permit her to act on these feelings or expose her sons to such behavior. When Robin returned with the boys from Canada and began living in a lesbian relationship with Karri in Baton Rouge, Jim sought a change in custody.
Following a review of the record in this matter, we find that Robin's decision to live with the children and her lesbian lover in the same residence was a change of circumstances which materially affects the welfare of the minor children. The testimony reflects that while Robin and Karri maintain separate bedrooms, they kiss, hug, embrace, and occasionally hold hands while in the presence of the children and others. Karri admitted that while she and Robin do not broadcast the nature of their relationship, they do not hide it. Karri further admitted that the boys understand that she is their mother's "girlfriend."
Robin testified that she and Karri do not engage in sexual relations while the children are present in the home, and further decided that "the only affection we would display [in front of the children] would be what we would be unashamed to display in anyone's presence." The testimony of several witnesses indicates that the public affection displayed by Robin and Karri for each other at various times and in the presence of the children went beyond the casual exchange of affections which might be expected in close female friendships.
But the issue in a custody dispute is not whether a particular relationship is morally acceptable, but whether that relationship adversely affects the child involved. Montgomery v. Marcantel, 591 So.2d 1272, 1273 (La.App. 3rd Cir.1991). At trial, Cynthia Metz, a former friend of Robin and Karri, testified that prior to Robin and Jim's separation, she and Jimmy, after announcing their presence, walked into Karri's apartment and observed Karri and Robin in a deep embrace on the sofa. Ms. Metz stated that upon observing this, she felt "embarrassed;" however, she noted Jimmy quickly averted his gaze, clinched his fists, and ran out of the apartment to sit on the steps. He was still sitting there looking dejected when Ms. Metz left the apartment some ten minutes later. Dr. Robert Snyder, a clinical psychologist retained by Jim, testified that despite his young age, Jimmy is aware of social situations both from what he hears at school and what he sees on television. Dr. Snyder opined that it was his belief that Jimmy understands that men and women are supposed to hug and kiss each other. If this event between his mother and Karri occurred in the manner described, then, in Dr. Snyder's opinion, it would have been a destructive emotional event for Jimmy because he would have been placed into conflict with the ordinary morays of society. If the child regularly witnessed similar displays of affection between his mother and this individual living in the same household, Dr. Snyder further opined that "the conclusion even for a ten year old would be inescapable that his mother lives in an unusual situation, and he probably would arrive to the conclusion of a socially unacceptable situation. Not unacceptable to the mother, but unacceptable to the larger society in which he travels every day."
On cross-examination, Jim recounted that Andrew once told him that, "Mom said gay is bad." When Dr. Snyder was asked to assume that such a statement was made, and to speculate on the effects of such a statement where the mother continued to live in such a relationship, he stated that a ten-year-old child:
doesn't have the emotional maturity to manage such, cognatively [sic] manage such concepts ... And a ten-year-old clearly is not old [enough] to be comfortable with his mother being in a situation ... where once [sic] she said it's ... bad or not good, and two, she's gonna do it. If that occurred, it would be totally inappropriate *765 way for an adult to behave with a child.
Additionally, the school in which Robin has enrolled Jimmy is a non-denominational private religious school which advocates Christian fundamentalist beliefs and teachings. In Dr. Snyder's opinion, "it would be a gross incongruity to send them to ... the Christian Life Academy, which not [sic] doubt espouses basic Christian principles, which all I read about are very much opposed to homosexual liaisons as acceptable, as I perceive them." Dr. Snyder went on to state that "[a] Christian school, it makes its standards clear, and if the mother does not meet the standards according to that school then it puts the children in a conflictual situation, no question."
When questioned as to his opinions concerning the best interest of the children, Dr. Snyder stated that in his opinion, both boys are insecure, extremely inhibited, exhibit repressed emotions and demonstrate a lack of spontaneity. Dr. Snyder went on to state that:
[H]aving made that professional judgment about what they are like ... my prescription would be ... that these are kids who for sure need a long period of stable predictable living and in a relatively conflict free environment ... in which artificial external conflicts do not become part of the family life. They need a long period of living in a family and school situation in which the conflict and change is minimized and predictability is maximized, that's what my feeling is.
Dr. Snyder did not meet with Robin; however, based upon his meetings with Jim and the boys, he viewed Jim to be the more stable parent based upon conventional criteria. With regard to Jim's fitness as a parent, Dr. Snyder stated that based upon his formal psychological evaluation and clinical interviews, he found Jim to be:
a very stable, conventional and predictable individual with a vocationally sound background and no criminal arrest or legal entanglements other than the divorce to my knowledge. He has an engaging, friendly and outgoing personality tempered by a conservative social orientation and firm but reasonable fundamental religious principles. His testing and my interview who him to be a sensitive man who is responsive to the subtleties of emotional needs of little children and one who is capable of being the sole domiciliary parent if necessary.
Based upon the foregoing, we must conclude that the trial court was not manifestly erroneous in concluding that Jim had met his burden of proving that Robin's decision to move in with Karri was a change of circumstances which materially affects the welfare of the minor children, and that a change of custody was warranted and in their best interest.
In her second and third assignments of error, Robin asserts that the trial court erred in relieving her as the stipulated domiciliary parent based upon her sexual orientation, and a provision in the joint custody agreement which was breached by both parents.
The custodial agreement signed by the parties expressly prohibits sexual activity or cohabitation by either party with any person to whom they are not married while the children are present in the home. Robin admits that she is a lesbian, and that she and her lover, Karri, have purchased a home where they live together, but contends that unlike Jim, she and Karri do not engage in sexual activity while the children are staying with them. Jim has admitted to engaging in sexual activities with his fiancé while the children were sleeping; however, the two did not spend the night together.
It is clear that an award of custody is not a tool to regulate human behavior. The only object is the best interest of the child. Everett v. Everett, 433 So.2d 705 (La. 1983); Blackledge, 652 So.2d at 595. One or several acts of adultery with the same person does not, per se, render a parent morally unfit who is otherwise suited for custody. Cassidy v. Cassidy, 514 So.2d 1198, 1200 (La.App. 1st Cir.1987), writ denied, 517 So.2d 814 (La.1988). In the present case, both parents admit to acts of adultery; however, the parent with primary custody lives in a homosexual relationship.
*766 In assessing whether a parent's sexual lifestyle is cause for removing or denying custody, we must consider whether the behavior was damaging to the children. This involves a determination of (1) whether the children were aware of the illicit relationship, (2) whether sex play occurred in their presence, (3) whether the furtive conduct was notorious and brought embarrassment to the children, and (4) what effect the conduct had on the family home life. Id. At 1200.
In brief, Robin argues that "[t]here is no evidence to support that the children are aware of the relationship between their mother and Karri or ... their father and his girlfriend." We cannot agree. Both Robin and Jim testified that they display affection for their respective partners in the presence of the children. Karri admitted that the children know her to be their mother's "girlfriend."
With regard to the second factor, there is no evidence to suggest that either party has engaged in sexual activity in the presence of the children; however, in his reasons for judgment, the trial judge noted:
It's clear from the testimony that ... the relationship between Ms. Martin and Ms. Scott is ... overtly sexual in nature, that the sexual nature of ... the relationship is communicated to these children ... [T]here is conduct taking place ... that has sexual underpinning [sic] uh before the children, hugging, kissing, embracing, holding hands ... that all has [sic] sexual underpinnings and it's sexually charged.
As to whether the furtive conduct of the parents was notorious and brought embarrassment to the children, Jim testified that Jimmy confided to him that he feels uncomfortable when kids at school inquire as to why two different women arrive to pick him up from after-school care. Additionally, we must conclude that because Robin and Karri have chosen not to hide the fact that they are a gay couple, their relationship is certainly not clandestine, and unlike more conventional relationships, far more likely to cause embarrassment particularly to young children.
With regard to the fourth and final factor, Robin alleges that the relationships maintained by both her and Jim have been discreet. Robin further cites Lundin v. Lundin, 563 So.2d 1273 (La.App. 1st Cir.1990), and argues that contrary to the facts presented therein, the displays of affection between herself and Karri do not exceed the bounds of friendship, and that formation of the boys' gender identity will not be affected. Claiming that the facts of Lundin are distinguishable, Robin asserts that she should not be denied custody because of her admitted homosexuality. We cannot agree.
As was the case in Lundin, the sexual preference of the mother in this case is known and openly admitted. Additionally, the record indicates that there have been similar open, indiscreet displays of affection beyond mere friendship. More importantly, unlike the mother in the Lundin case, Robin shares a home with her partner. While we certainly do not condone Jim's admitted acts of adultery with his fiance, we cannot agree with Robin's inference in brief that her openly homosexual lifestyle is less damaging to the children because she and Karri refrain from sexual activity while the children are present in their home. We affirm our earlier holding in Lundin wherein we stated that "[t]he mere fact of homosexuality may not require a determination or moral unfitness so as to deprive the homosexual parent of joint custody;" however, this holding does not address the issue of whether, under a joint custody arrangement, a homosexual parent who openly resides with his or her partner would be entitled to primary custody of the minor children. It is the opinion of this court that under such facts, primary custody with the homosexual parent would rarely be held to be in the best interests of the child.
After consideration of the foregoing factors and the record, we must conclude that the trial judge's award of primary custody to Jim was appropriate in light of the adverse impact on the children resulting from Robin's unconventional living arrangement.
In her final two assignments of error, Robin alleges that the trial court erred in failing to appoint a mental health professional as requested, and thereafter, failing to grant a new trial. Specifically, Robin contends that because the trial court failed to *767 appoint a mental health professional as requested by Jim, its subsequent allowance of testimony by Dr. Robert Snyder, a psychologist retained by Jim constituted an abuse of discretion.
The motion for change of custody filed by Jim on December 16, 1993 prayed for the court to appoint a mental health professional pursuant to former La.Civ.Code art. 131(H). The prior language of that article, which was repealed, revised and reenacted as La.R.S. 9:331 by virtue of Acts 1993, No. 261, provided as follows:
In a custody or visitation proceeding, an evaluation may be ordered on the motion of either party. The evaluation shall be made by a mental health professional agreed upon by the parties or selected by the court. The court may apportion the costs of the investigation between the parties and shall order both parties and the children to submit to and cooperate in the evaluation, testing, or interview by the mental health professional. The mental health professional shall provide the court and both parties with a written report. The mental health professional shall serve as the witness of the court subject to cross-examination by either party. For the purposes of this Article, "mental health professional" means a psychiatrist or a person who possesses a Master's degree in counseling, social work, psychology, or marriage and family counseling.
In the instant case, Robin asserts that she "agreed" to Jim's request for the appointment of a mental health professional; however, there is no evidence in the record to support Robin's contention that prior to the hearing in this matter, she concurred in the appointment of an expert. Robin further argues that she had not knowledge that Jim had decided to retain his own expert, and because she believed the court would appoint an independent evaluator for whose fee she would be partly responsible, she could not be expected to incur the additional expense of retaining her own expert.
In brief, Robin concedes that under the language of the article and the jurisprudence, the decision of whether or not a psychological evaluation should be ordered lies within the trial judge's much discretion. We agree. Timmons v. Timmons, 605 So.2d 1162, 1166 (La.App. 2nd Cir.), writ denied, 608 So.2d 195 (La.1992). In recognition of this fact, we cannot ascertain why Robin nevertheless relied on the trial court and failed to retain her own expert in time for the hearing.
The trial court apparently believed that the appointment of a psychological evaluation of the parties was unnecessary to its determination that the best interests of the children mandated a change in custody.
Robin further argues that important evidence relative to her skills as a parent was discovered following the hearing, which could not have been discovered earlier. For this reason, Robin contends that the trial court erred failing to grant her motion for a new trial. Specifically, Robin asserts that since the trial in this matter, she and the children have undergone a psychological evaluation conducted by her own expert, Dr. Raymond Houck, and that the conclusions reached by this expert differed from those of Dr. Snyder.
Because Robin has put forth no credible showing as to why she could have obtained this evidence with due diligence prior to trial, the trial court was not required under La. Code Civ.Proc. art. 1972 to grant her motion for a new trial. Absent such a showing, we cannot say that the trial court's refusal to grant Robin a new trial constitutes an abuse of discretion.
These assignments of error are without merit.

DECREE
For the foregoing reasons, the judgment of the trial court is AFFIRMED at defendant-in-rule-appellant's cost.
LOTTINGER, C.J., dissents and assigns reasons.
LOTTINGER, Chief Judge, dissenting.
I respectfully dissent from the majority opinion.
*768 After a thorough review of the record in this matter, I cannot conclude that Ms. Scott is an unfit mother solely on the basis of two isolated incidents related by third parties, and Dr. Snyder's speculations as to the probable impact of these incidents on the children. In the present case, both parties admit to acts of adultery; however, the parent with primary custody lives in a homosexual relationship. Because there is no evidence in the record to suggest that the boys are aware of and adversely affected by their mother's unconventional lifestyle or the sexual nature of her relationship with Ms. Martin, I am forced to conclude that Mr. Scott has failed to show that a change of custody in his favor would be in the best interest of the children at this time. I am of the opinion that the trial judge's decision was manifestly erroneous.
Dr. Snyder did offer his opinions as to the boys' best interest, but I note that he did not evaluate Ms. Scott, nor did he relate any specific instances where external conflicts have intruded upon and affected the boys' life with their mother. While I express grave concerns as to Ms. Scott's ability to shield her children in the future from negative criticism of her chosen lifestyle, I cannot and will not allow such fears dictate my decision in this case.