I2REMY CHIASSON, Judge Pro Tem.
In this child custody action, the family court maintained the joint custody arrangement, but found that there had been a change of circumstances materially affecting the welfare of the minor child, and designated the child’s father as the new domiciliary parent. The family court further granted liberal visitation, as much as possible, to the mother, but stipulated that the child was not to be near, or in the vicinity of certain individuals. From this judgment, the mother now appeals.
FACTS
The parties hereto, Alfred Daniel Kyle, II (hereafter, “Mr.Kyle”) and Jeni Melinda Leeth (hereafter, “Ms.Leeth”) were never married, but through their relationship, conceived a child which was born on June 9, 1990. The child, named Jena Marie Kyle (hereafter, “Jena”), was purportedly acknowledged by her father, Mr. Kyle, through a notarial act.[2]
The record reflects that following Jena’s birth, Mr. Kyle and Ms. Leeth lived together with Jena (and Ms. Leeth’s son from an earlier relationship), in a house they rented from Mr. Kyle’s father.' Ms. Leeth’s mother, Rosetta “Sissy” Léeth[3], also resided at that address. Two and a half years later, in January of 1993, Mr. Kyle moved out, and filed, on November 12, 1993, a petition seeking joint custody of Jena. The matter was called for hearing in June of 1994, and the parties entered into a stipulation as to joint custody, child support and visitation. Ms. Leeth was designated as the domiciliary parent. Thereafter, on October 10, 1995, and June U> 1996[4], several stipulated judgments were signed extending Mr. Kyle’s visitation rights with Jena both during the week and in summer.
On June 19, 1996, two days after the signing of the latest stipulated judgment, Mr. Kyle filed a Petition For Change Of Custody wherein he alleged that he had recently obtained information that Ms. Leeth’s boyfriend, Charles Andrew Wright (hereafter, “Mr. Wright”), had been involved in activities which, in his view, posed a serious threat of bharm to Jena, and further, that Jena resided primarily with Ms. Leeth’s mother, Rosetta Leeth, who was the child’s primary caretaker. Mr. Kyle sought an award of sole custody, or in the alternative, to be designated as the child’s domiciliary parent pursuant to a plan of joint custody. Mr. Kyle further sought to enjoin Mr. Wright from having Jena in his presence.[5]
ACTION OF THE FAMILY COURT
Following a hearing wherein both parties presented witnesses and submitted evidence, the family court determined that there had been a change of circumstances materially affecting Jena’s welfare. In addition, the court, after considering the evidence presented, concluded that Mr. Kyle had met his burden of showing a change in circumstances, and further, that it was in Jena’s best interest that Mr. Kyle be named as the domiciliary parent, with liberal visitation rights granted to Ms. Leeth. The court further ordered that Jena was not to be near, or in the presence of, either Ms. Leeth’s boy *499 friend, Mr. Wright, or Ms. Leeth’s stepfather, John Kendrick.[6] From this judgment, Ms. Leeth now appeals.
ISSUES ON APPEAL
On appeal, Ms. Leeth presents the following issues for consideration by this court:
1) Whether the family court properly considered facts and circumstances that existed prior to the original setting of custody in this matter when all parties were aware of said circumstances at the time of the original setting;
2) Whether the family court was justified in considering possible future harm to the child over the circumstances regarding child custody as they actually existed prior to this present change of custody; and
3) Whether the family court properly applied the burden of proof applicable to cases such as this where a change of custody is requested.
^DISCUSSION
At the outset, we are mindful that the original joint custody decree was entered by stipulation of the parties, and consequently, it is not a “considered decree”. Scott v. Scott, 95-0816, p. 4 (La.App. 1st Cir.12/15/95); 665 So.2d 760, 763, writ denied, Rowan v. Scott, 96-0181 (La.2/2/96); 666 So.2d 1106. Accordingly, where no considered decree of custody has been rendered, a party seeking to modify an existing custody arrangement is relieved of the'“heavy burden” normally imposed, and is not required to prove that the continuation of the present custody arrangement is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child. Smith v. Smith, 615 So.2d 926, 931 (La.App. 1st Cir.), writ denied, 617 So.2d 916 (La.1993). Nevertheless, a party seeking to modify an existing custody arrangement must still convince the court that there has been both a material change of circumstances since the original decree and that the proposed modification would be in the best interest of the child. Bercegeay v. Bercegeay, 96-0516, p. 3 (La.App. 1st Cir.2/14/97); 689 So.2d 674, 675-6.
Every child custody case must be viewed within its own peculiar set of facts. Connelly v. Connelly, 94-0527, p. 4 (La.App. 1st Cir.10/7/94); 644 So.2d 789, 793. It is well settled that the determination of the trial judge in child custody matters is entitled to great weight, and his discretion will not be disturbed on appeal in the absence of a clear showing of abuse. Bergeron v. Bergeron, 492 So.2d 1193, 1196 (La.1986).
ADMISSION OF OTHER EVIDENCE
We now turn our attention to the first issue raised by Ms. Leeth. Ms. Leeth asserts that the family court erred in considering evidence of certain improprieties which her former stepfather, John Kendrick (hereafter, “Mr.Kendrick”), allegedly committed with her on one occasion when Ms. Leeth was eleven years of age. Ms. Leeth complains, as part of her appeal in this matter, that based upon the pleadings, she had no knowledge prior to the hearing that this incident would be raised as an issue in this matter.
Based upon the testimony adduced at the hearing, it is apparently undisputed that during the summer of 1991, Ms. Leeth, while vacationing with Mr. Kyle and his family, openly disclosed that her then-stepfather, Mr. Kendrick,, “molested” her when she was ^eleven years of age. Mr. Kyle’s father, Alfred Daniel Kyle, I, (hereafter, “Dr.Kyle”) testified that Ms. Leeth, when pressed, stated only that her stepfather had “touch[ed] her in places that she did not like.” In her testimony, Rosetta Leeth, admitted that her daughter disclosed to her, shortly after the alleged incident, that her then-husband, Mr. Kendrick, ran his hand down her arm, and allowed his thumb to contact her across her breast. This was by all accounts an isolated incident; however, Rosetta Leeth and Mr. *500 Kendrick ultimately divorced years after the incident in 1992.'
It is evident from the record that despite the fact that he and Rosetta Leeth are divorced, Mr. Kendrick still maintains a close relationship with his former wife and her daughter. It is unclear how frequently he visits the family’s home; however, it is undisputed that Mr. Kendrick frequently picks Jena and her brother up after school, attends the children’s softball games, and has, on at least one occasion, taken the children to a movie while their mother and grandmother did Christmas shopping. At trial, Jena’s mother, Ms. Leeth, testified that she does not believe that her former stepfather poses a threat to her children.
In light of the considerable discretion afforded the family court in its quest to ascertain the best interest of the child, we decline to say that the introduction of testimony regarding Mr. Kendrick constituted an abuse of discretion. We conclude that this assignment is without merit.
CHANGE OF CIRCUMSTANCES
In her next two assignments of error, Ms. Leeth argues that the family court erred in determining that Mr. Kyle had met his requisite burden of establishing that a material change of circumstances had arisen since the original decree, and that designation of Mr. Kyle as Jena’s domiciliary parent would be in her best interest.
The family court, in written reasons for judgment issued October 8, 1997, stated that there had been a material change of circumstances affecting the child’s health and welfare on the grounds (1) that Jena lived with her maternal • grandmother, Rosetta Leeth, seventy-five percent of the time “from 1993 until some time late in 1996”, while the child’s mother, Ms. Leeth, lived with her boyfriend, Mr. Wright, and (2) that the said Mr. Wright, had previously entered a plea of no contest to a child molestation charge involving the children of his former wife, and was therefore, a, convicted felon. Based kupon the aforementioned findings, the family court went on to conclude that designation of Mr. Kyle as the domiciliary parent would be in Jena’s best interest.
While mindful of the great deference afforded the trial court in determining matters of child custody, this court, after a thorough review of the record, is forced to conclude that the family court erred in its determination that Mr. Kyle met his burden of proving a change in circumstances sufficient to warrant a modification of the existing custody decree. Accordingly, we reverse.

Caretaker Of The Child

Based upon our reading of the record in this matter, it is undisputed that following Mr. Kyle’s departure in January of 1993, Ms. Leeth, her two children, Matthew Leeth and Jena Marie Kyle, as well as Ms. Leeth’s mother, Rosetta Leeth (collectively referred to as “the Leeths”), continued to reside at the house on Rampart Court which they had formerly shared with Mr. Kyle, and which the Leeths continued to rent from Mr. Kyle’s father, Dr. Kyle. It is undisputed that in August of 1994; Dr. Kyle requested that the Leeths vacate the Rampart Court premises [7]. Ms. Leeth and her mother testified that they and the children were forced to move in with Ms. Leeth’s maternal grandmother until such time as they could find a house to purchase within their budget. Ms. Leeth stated that while there are three bedrooms in her grandmother’s home, these rooms were occupied by her grandparents, and her aunt, uncle and cousin who also resided in the house. As a consequence, Ms. Leeth, her two children, and her mother slept on a couch and a double bed in the living room of the home.
Ms. Leeth further testified that since the fall of 1991, she has been continuously enrolled, on either a full or part-time basis, as a student at Southeastern University in Hammond, Louisiana, where she is majoring in accounting. Ms. Leeth also works thirty *501 hours a week as a waitress at the Waffle House in Baton Rouge. After living at her grandmother’s home for several months, Ms. Leeth stated that she found that it very difficult to study due to the fact that her children could not sleep with the living room light on. For this reason, Ms. Leeth testified that she took some of her things, and stayed during the week at the apartment of her boyfriend, Mr. Wright. By her own estimation, H-Ms. Leeth stated that from the fall of 1994 until late May of 1996, she spent about 75% of her time at Mr. Wright’s apartment; however, Ms. Leeth also stated that during the week she would pick her children up from school, prepare supper for them at Mr. Wright’s apartment, and then her mother would bring them back to her grandmother’s at bedtime. On the weekends, Ms. Leeth would spend the day with her children, and work at the Waffle House at night..
On cross-examination, Mr. Kyle admitted that between the time from January of 1993, when he left Ms. Leeth and moved out of the Rampart Court house until the spring of 1996[8] when he moved into his parents’ home, Mr. Kyle was married for 15 to 18 months to a woman named Candace.
On October 31, 1995, Ms. Leeth, with her mother’s assistance, purchased a home 15-20 miles outside of Baton Rouge in Gonzales, Louisiana. After making some initial repairs to the house, Rosetta Leeth and the children moved into the house on April 7, 1996. Ms. Leeth testified that she did not personally move into her house until after her final exams in May of 1996.
Since moving into her own home at the end of May, 1996, there is nothing in the record to indicate that Ms. Leeth continued to spend time with her boyfriend, Mr. Wright, to the detriment of her children.[9] Moreover, there is no evidence that Ms. Leeth spent any time away from her children other than to attend school or work.
In the opinion of this court, the actions taken by Ms. Leeth during this period can be explained, at least in part, by the less than ideal circumstances under which she was forced to live. Based upon her testimony, Ms. Leeth appears to be a very hardworking single parent who is attempting to balance the demands of motherhood and work while struggling to provide a better life for herself, her mother, and her two minor children by attending college. In our opinion, the family court erred in its determination that there existed a change of circumstances based upon its finding that Ms. Leeth’s mother, Rosetta Leeth, was Jena’s primary caretaker from “from 1993 until some time late in 1996”. At the time this matter was heard in April of 1997, there is no indication that these ^circumstances still existed. Furthermore, we do not believe that these circumstances, even if present, would warrant uprooting a six and a half year old little girl from the custody and security of her mother, maternal grandmother and step-brother.

Issue Regarding Mr. Wright

In addition to finding that Ms. Leeth’s mother, Rosetta Leeth, had been the primary caretaker of the child, the family court further found that there had been a change of circumstances based on its determination, “that Charles Andrew Wright is a convicted felon, pleading no contest to a charge of molestation of a child and he is currently on probation.”
It is evident, based upon our reading of the record, that the family court erred in determining that Mr. Wright was a "convicted felon” inasmuch as Mr. Wright never entered a no contest plea to the charge of child molestation. According to the record, Mr. Wright and his ex-wife, Judith Chavers, were arrested in November of 1995 on charges of two counts each of molestation of a juvenile. The offenses allegedly took place between the fall of 1989 and the spring of 1991, and involved Ms. Chavers’ two minor sons from a previous marriage. At the time of the al *502 leged offenses, the boys in question were 4 and 6 years of age. Mr. Wright and Ms. Chavers were subsequently indicted in early 1996; however, both Mr. Wright and Ms. Chavers were later placed in a pre-trial intervention program purportedly at the strong urging of the boys’ father who did not want to force his sons to re-live the experience. As a consequence, Mr. Wright and Ms. Chavers were each placed on five years’ probation and were denied contact with the children in question.
As we have previously noted, there are references in the testimony to the effect that an injunction was previously issued against Mr. Wright in the instant matter. Inasmuch as we have no evidence in the record before us to substantiate the issuance of such an injunction, but believing same to be in Jena’s best interests, we hereby maintain the family court’s prohibition against Charles Andrew Wright being “anywhere near or in the vicinity of’, the minor child, Jena Marie Kyle.
Based upon the foregoing, we must conclude that the family court was manifestly erroneous in its determination that Mr. Kyle met his burden of demonstrating a material bchange in circumstances sufficient to warrant a modification of the existing custody decree. For this reason, we find that the family court erred in designating Mr. Kyle as Jena’s domiciliary parent, and accordingly, reverse.
CONCLUSION
For the foregoing reasons, we hereby reverse the family court’s judgment to the extent it designates Mr. Kyle as the domiciliary parent of the minor child, Jena Marie Kyle, based upon an alleged material change in circumstances. We maintain and affirm that portion of the family court’s judgment prohibiting Charles Andrew Wright from being “anywhere near, or in the vicinity of’, the minor child, Jena Marie Kyle. All costs associated with this appeal are assessed against the plaintiff-appellee, Alfred Daniel Kyle, II.
REVERSED IN PART, AFFIRMED IN PART, AND RENDERED.

. The initial Petition For Custody filed on behalf of Mr. Kyle on November 12, 1993, alleges that he, "acknowledged the paternity of the minor child by Notarial Act of Acknowledgment attached hereto.” While no such acknowledgment appears in the record, Mr. Kyle, as part of his direct testimony, stated that he is the child’s father, and moreover, the parties do not appear to dispute this issue.

. Ms. Leeth's mother testified that she is presently divorced from Ms. Leeth's stepfather, John Kendrick; nevertheless, she is alternately referred to in the record as Rosetta Leeth or "Sissy" Kendrick, To avoid confusion with her daughter, Ms. Leeth's mother will be referred to herein as "Rosetta Leeth".

. It should be noted that hearings in these matters were previously held on May 16, 1995, and May 21, 1996.

. Ms. Leeth alleges in her brief that “[t]he parties voluntarily entered into a stipulation whereby an injunction was issued prohibiting [Ms Leeth] from having the minor child in the presence of Charles Andrew Wright”. Additionally, the parties made reference at trial to the issuance of an injunction against Mr. Wright in June or July of 1996; however, we can find no evidence in the record to substantiate that such an injunction was in fact issued.

. During the course of the hearing, testimony was introduced, which was subsequently corroborated by Ms. Leeth, to the effect that her former stepfather, John Kendrick, had “molested” her when she was eleven years old.

. Ms. Leeth testified that Mr. Kyle's father, Dr. Kyle, simply "evicted" the Leeths in August of 1994. In his testimony, Dr. Kyle stated that when his son was required to pay child support, he felt he should increase the rent on the house occupied by the Leeths. Because the Leeths were purportedly unwilling to pay the increased rent, Dr. Kyle testified that he sent them a letter asking them to move.

. Mr. Kyle testified on April 17, 1997, at the hearing in this matter, that he had been living with his parents for "about a year”. It appears that Mr. Kyle must have moved in with his parents shortly before filing the instant rule for custody on June 19, 1996.

. Ms. Leeth testified that currently, the only time Mr. Wright spends time at her house is on weekends when Jenna is visiting her father, and then, on those nights when Ms. Leeth is at home.