99 P.3d 111

**Shawn L. McGRIFF, Plaintiff–Respondent,**

v.

**Theron W. McGRIFF, Defendant–Appellant.**

No. 28910.

Supreme Court of Idaho,
Boise, May 2004 Term.

Sept. 21, 2004.

Racine, Olson, Nye, Budge & Bailey, Chtd., Pocatello, for appellant. Richard A. Hearn argued.

Holden Kidwell Hahn & Crapo, PLLC, Idaho Falls, for respondent. Marie T. Tyler argued.

TROUT, Justice.

Theron McGriff ("Theron" or "Father") appeals the magistrate judge's order granting Shawn McGriff's ("Shawn" or "Mother")

motion to modify custody of their two children and denying his motion for the same. Theron alleges that the magistrate lacked jurisdiction to modify custody when he had already dismissed Shawn's petition, that the court erred when it found substantial and material changes in circumstances meriting a change in the custody arrangement, and that the court erred in basing its order modifying custody on Theron's sexual orientation. Theron also appeals the magistrate's subsequent decision granting Shawn attorney fees on appeal.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

Theron and Shawn were divorced in February 1997, after approximately seven years of marriage. Two daughters were born as the issue of the marriage and the divorce decree provided that both parents would share legal and physical custody of children, one now thirteen and the other now nine. This decree incorporated the stipulation that a parenting plan would direct that the children reside with Shawn from Sunday evenings through Wednesday mornings and with Theron from Wednesday evenings through Sunday mornings, with the parents alternating holidays.

In December 2000, Shawn filed a petition to modify the decree of divorce, alleging that substantial and material changes had occurred in the circumstances of the parties since the entry of the decree and that the modification was in the best interests of the children. Specifically, Shawn alleged that " . . . events have occurred with respect to [Theron's] intimate relationship with a person of the same sex which have completely changed the circumstances, such that it is no longer in the best interests of the girls that they spend one-half of the overnights each week with [Theron]." Shawn alleged as further substantial and material changes that Theron "has failed to deal with his homosexuality in a responsible and emotionally stable manner, [which] requires the parenting plan to be modified . . . ," and that the children's young age and unfamiliarity with homosexu-

ality also supported a modification. As part of her petition Shawn requested primary physical custody, granting Theron reasonable visitation consisting of alternating weekends and holidays. Shawn also requested that Theron "be required to seek professional assistance in dealing with his homosexuality and the manner in which his homosexuality is explained to the minor children."

In June 2001, the magistrate judge appointed Dr. Mark Corgiat to conduct a parenting evaluation of Theron and Shawn. Dr. Corgiat found that both Theron and Shawn were "good parents who have cared well for the children" and that the children did not want any change in the custody arrangements. Additionally, he found that both parents have "been involved in inappropriate expressions of anger toward one another in front of the children," and that they both have "tendencies towards violation of appropriate parental boundaries in expressing their difficulties with one another." Dr. Corgiat recommended that the custody arrangement remain unchanged but, because he found Shawn's concerns regarding how Theron addressed his sexual orientation to be valid, he recommended that the two parties obtain the help of a professional "who can assist them in presenting this information collaboratively to their children." He also recommended counseling for both parents regarding appropriate parent-child boundaries, finding that "[t]he parental alienation that has evolved through mismanagement of their anger towards one another has already affected the children. Any continuation of this will again be to the children's detriment."

In September 2001, Theron filed his own petition to modify custody, denominated as a "Counterclaim to Modify Decree of Divorce." As grounds he alleged that he "has attempted to work with [Shawn] regarding health care, educational support (the acquisition of school supplies) and other matters with [Shawn] but [she] refuses to discuss these matters with [him] all to the detriment of the minor children of the parties." In his petition, Theron requested that Shawn pay him child support and that she be awarded visita-

tion on alternating weekends and holidays and extended periods over the summer.

Pursuant to Dr. Corgiat's recommendations, the magistrate judge entered an Order for Counseling on October 24, 2001. In this, the court ordered: "[T]he pending Petitions filed by both parties shall be and hereby are dismissed." Theron and Shawn were ordered to attend counseling with Dr. Howard Harper, upon whom both parties had agreed as a counselor. The magistrate subsequently found that Theron then ignored repeated requests by Shawn through her attorney to begin the counseling, and when they finally agreed to begin counseling, Theron insisted on counseling sessions separate from Shawn. Further, the court found that during his first session, Theron presented a "list of demands," which he insisted must be addressed before any further communication could be considered, which demands were unrelated to Dr. Corgiat's recommendations. The magistrate judge then found that Theron took his daughters to a separate counselor, Sue Heng, without notice to or the agreement of Shawn. After doing so, Theron revealed his sexual orientation to the older daughter, again without notice to Shawn and without her being present, despite her repeated requests to be present when this happened.

On January 16, 2002, the court entered a Notice of Status Conference setting a conference for January 30, 2002. Though no record was made of this conference, at which Judge Riddoch and counsel for both parties were present, the court reinstated both Shawn's petition and Theron's counterpetition, apparently with the agreement of both counsel. At the end of this conference the court entered a pre-trial order setting trial and other dates.

After a trial, at which witnesses for both sides testified and the issues were briefed by counsel, the magistrate judge entered his order, granting Shawn's motion to modify custody and denying Theron's motion. In that order, the court awarded legal and physical custody of the children to Shawn and ordered Theron to pay child support to Shawn in the amount of $842.00 per month. The magistrate judge allowed Theron reasonable visitation, defined as "alternate weekends and holidays and six weeks during the Summer, provided Father is not residing in the same house with his male partner and in accordance with Mother's proposal in paragraph 3 on pages 1 and 2 of her Exhibit A to her closing argument [setting forth the visitation times and dates in more detail]." The court also denied any award of attorney fees, finding that neither party presented frivolous arguments and each had the ability to pay their own fees and costs.

Thereafter, Theron filed a notice of appeal pursuant to I.A.R. 12, seeking a permissive expedited appeal from the magistrate judge directly to this Court, which was granted.

Shawn then filed a motion for attorney fees on appeal, claiming that due to disparate financial circumstances between her and Theron, she was unable to pay her own attorney fees. After a hearing, the magistrate judge ordered Theron to assist in paying Shawn's attorney fees on appeal through a one-time payment of $750.00 and followed by $500.00 per month thereafter. Theron then amended his notice of appeal to include the issue of whether the magistrate was correct in granting Shawn attorney fees on appeal.

## II.

### STANDARD OF REVIEW

Decisions regarding child custody are committed to the sound discretion of the magistrate, and the magistrate's decision may be overturned on appeal only for an abuse of discretion. *Biggers v. Biggers*, 103 Idaho 550, 555, 650 P.2d 692, 697 (1982); *Moye v. Moye*, 102 Idaho 170, 171, 627 P.2d 799, 800 (1981). An abuse of discretion occurs when the evidence is insufficient to support a magistrate's conclusion that the interests and welfare of the children would be best served by a particular custody award or modification. Appellate courts, however, are not permitted to substitute their own view of the evidence for that of the trial court, nor to make credibility determinations. *Brammer v. Brammer*, 93 Idaho 671, 674, 471 P.2d 58, 61 (1970). Moreover, in considering findings of fact made by the trial court, the reviewing court must review the evidence

in the light most favorable to the party who prevailed at trial. . . .

*Pieper v. Pieper,* 125 Idaho 667, 669, 873 P.2d 921, 923 (Ct.App.1994).

## III.

### THE JURISDICTION OF THE MAGISTRATE

■ The first issue Theron raises on appeal is the jurisdiction of the magistrate to hear the petitions for modification of custody, because the trial court dismissed both petitions in its October 24, 2001, Order for Counseling. Theron maintains that because the trial court dismissed both petitions in that Order, it was without jurisdiction to reinstate them and Shawn was required to refile a petition to modify custody in order for the magistrate to have jurisdiction to consider it. Clearly, the magistrate judge had personal jurisdiction over both parties to this action, so the only issue relates to subject matter jurisdiction. We do not agree with Theron's analysis of the magistrate's authority to act.

The Order for Counseling issued by the magistrate judge was the result of a stipulation by both parties agreeing to the dismissal of their petitions and to attend counseling with Dr. Harper, in an effort to resolve the issues between them. As the record shows, Dr. Harper subsequently wrote to the magistrate in January 2002, stating that counseling had reached an impasse largely due to Theron's refusal to attend joint counseling with Shawn and his presentation of a list of demands which he asserted must be met before he would proceed further with the counseling. As such, the magistrate was faced with a situation where there remained substantial issues in a child custody case that needed to be resolved by the court due to the inability of the parents to settle these issues on their own.

Section 32–717 of the Idaho Code states in part: "In an action for divorce the court may, before and after judgment, give such direction for the custody, care and education of the children of the marriage as may seem necessary or proper in the best interests of the children." This statute confers continuing jurisdiction in matters pertaining to child custody. *Stockwell v. Stockwell,* 116 Idaho 297, 303, 775 P.2d 611, 617 (1989); *Ford v. Ford,* 108 Idaho 443, 444–45, 700 P.2d 65, 66–67 (1985); *Chislett v. Cox,* 102 Idaho 295, 298, 629 P.2d 691, 694 (1981). In Idaho, the courts retain jurisdiction, that is the authority to preside over child custody matters, over minor children in divorce and custody proceedings until they reach the age of majority, and consequently there can be no loss of subject matter jurisdiction until the children are no longer subject to the court's authority.

Theron cites the case of *Castle v. Hays,* 131 Idaho 373, 957 P.2d 351 (1998) to support his contention that a party must seek relief from an order of dismissal within fourteen days according to I.R.C.P. 11(a)(2)(B) or file an appeal to obtain appellate review, and that failure to take such steps results in a divestiture of jurisdiction. However, *Castle* was a personal injury action which had been dismissed for inactivity and is not like a child custody case where the court retains continuing jurisdiction. Here, Theron and Shawn both consented to the reinstatement of their petitions to modify custody and Theron proceeded to trial without objecting to the procedure being followed. Where both parties in a child custody proceeding agree to treat the former petitions as properly filed before the court and proceed accordingly, the court is not divested of jurisdiction.

## IV.

### MATERIAL CHANGE IN CIRCUMSTANCES

■ Theron asserts that Shawn failed to present any material change in circumstances meriting a modification of the custody arrangement. Specifically, he argues that Shawn's petition to modify claimed Theron's homosexuality and issues related to it as the sole change in circumstances meriting a change in custody and, because Theron maintains that homosexuality in itself cannot be grounds for changing custody, Shawn failed to assert any valid material changes that would enable the court to consider a modification.

We have held that a court is not confined by the allegations of the petition to modify in

seeking out what custody arrangement would be in the best interest of the child. In *Poesy v. Bunney,* 98 Idaho 258, 261–62, 561 P.2d 400, 403–04 (1977), this Court established:

> While the material, permanent and substantial change standard is a sound legal principle, care must be exercised in its application. The tendency is to search for some greatly altered circumstance in an attempt to pinpoint the change called for by the rule. Thus, the emphasis is placed on defining some change, and making that change appear, in itself, to be material, permanent and substantial. This focus is misleading. The important portion of the standard is that which relates the change in conditions to the best interest of the child. The changed circumstance standard was designed, as a matter of policy, to prevent continuous re-litigation of custody matters. That policy goal, however, is of secondary importance when compared to the best interest of the child, which is the controlling consideration in all custody proceedings. The court must look not only for changes of condition or circumstance which are material, permanent and substantial, but also must thoroughly explore the ramifications, vis-à-vis the best interest of the child, of any change which is evident.

As stated in *Poesy,* the best interests of the child must take precedence in any analysis regarding a material change in circumstances. This, *Poesy* emphasizes, "is the controlling consideration in all custody proceedings." This Court has more recently upheld this standard in *Levin v. Levin,* 122 Idaho 583, 586, 836 P.2d 529, 532 (1992) in which we stated that "although the threshold question is whether a permanent and substantial change in the circumstances has occurred, *the paramount concern is the best interest of the child.*"

■ Consequently, if the trial court finds "any change which is evident" representing a material circumstance that affects the best interest of the child in a custody proceeding, not only does the trial court have the discretion to make such findings if the evidence supports them, it is required to do so. Accordingly, the controlling question in this case—where the judge made findings as to the best interests of the children largely outside of those changes originally alleged by Shawn—is not whether Shawn adequately alleged a material change of circumstances in her petition, but rather, whether the evidence supports the findings made by the magistrate as to a change of circumstances and whether the best interests of the children were served by considering a modification of the custody arrangement.

In his findings relating to a material change of circumstances, the magistrate judge stated:

> Mother established the requisite showing of change in circumstances justifying the Court's review of the custody arrangement in the best interest of the girls including: Father's plan to openly reside with his homosexual partner without proper joint communication with the children; the girls' current difficulty and adjustment in changing residence each Wednesday; Father's impending move and change of schools for [the younger child]; Father's continuing refusal to communicate directly with Mother and to allow her to participate in important communications and decisions regarding the girls.

In the next section of this opinion we will discuss the propriety of basing any decisions relating to custody on the sexual orientation of either parent. Suffice it to say that for the purposes of determining whether there had been a material change of circumstances, the magistrate's findings that the girls were having difficulty handling the twice weekly change of residence and that Theron was continuing to refuse to communicate directly with Shawn in any way, provide a sufficient basis to examine the best interests of the children and consider a modification of the custody arrangement.

## V.

## MODIFICATION OF CUSTODY

### A. Findings relating to homosexuality

The primary assertion in Theron's appeal is that the magistrate wrongly based his decision to award Shawn sole legal and physical custody of the children based on Ther-

on's homosexuality. Admittedly, the allegations in Shawn's petition to modify were based largely on Theron's homosexuality and the magistrate judge did make specific reference to how Theron communicated his sexual orientation to the two children. However, it does not appear that the magistrate's decision to modify custody was based on Theron's homosexuality. The magistrate stated:

Father's homosexuality may not influence his/her (sic) parenting ability per se, and this Court does not decide the custody and visitation issues on that basis. However, Father's decision to openly co-habit with Nick Case, his partner, is a change in circumstances which needed to be jointly communicated to the girls in an appropriate manner. It is a change that will generate questions from the girls and their friends regarding their Father's lifestyle. Moreover, Father has minimized this issue in regard to the conservative culture and morays (sic) in which the children live. Father has shown some insensitivity to the girls' needs regarding his lifestyle, even contrary to the recommendations of the Court-appointed evaluator Dr. Corgiat and expressly contrary to the requests of and excluding the children's Mother.

The majority of findings upon which the magistrate based his decision to modify custody, which will be discussed later, were unrelated to Theron's homosexuality. However, because the magistrate did make findings as to how Theron's homosexuality was to be communicated to the children and "the girls' needs regarding his lifestyle," it is necessary for us to discuss this issue.

■ In his decision, the magistrate found that Theron's choice of lifestyle should not be minimized in light of the conservative culture and values of the community in which the parties and the children reside. While we acknowledge that homosexuality is a sensitive issue and that a parent may feel he or she has a valid concern about the way in which the other parent communicates this to their children; whether or not a parent's sexual orientation will, in and of itself, support a change in custody of the children is a different issue altogether. It is important to observe that last year's landmark United States Supreme Court decision in *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) legalized the practice of homosexuality and in essence made it a protected practice under the Due Process clause of the United States Constitution. Justice Anthony Kennedy, writing for the majority, wrote:

The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government. "It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter."

539 U.S. at 578, 123 S.Ct. at 2484, 156 L.Ed.2d at 525–26. This decision also has at least some bearing on the degree to which homosexuality may play a part in child custody proceedings. But even before the *Lawrence* decision was handed down, it was established in a number of state courts across the nation that a homosexual parent may not be denied custody of a child unless there is sufficient evidence presented to show that the parent's homosexuality is having a negative effect on the child and that the parent's custody is not in the best interests of the child. Only when there is a nexus between harm to the child and a parent's homosexuality, can that parent's sexual orientation be a factor in determining custody of a child. *See, e.g.*, *T.C.H. v. K.M.H.*, 784 S.W.2d 281 (Mo. App.1989), In *In re Marriage of Birdsall*, 197 Cal.App.3d 1024, 243 Cal.Rptr. 287 (1988), *Pryor v. Pryor*, 714 N.E.2d 743 (Ind.App. 1999), *Scott v. Scott*, 665 So.2d 760 (La.App. 1995). In light of this Court's prior focus in custody matters on the best interests of the child, we find these cases to be persuasive authority. Sexual orientation, in and of itself, cannot be the basis for awarding or removing custody; only when the parent's sexual orientation is shown to cause harm to the child, such that the child's best interests are not served, should sexual orientation be a factor in determining custody.

According to the record, Theron did not begin his relationship with Nick Case until over three years had elapsed following the divorce. In late 2000, Theron decided to have Case move in with him. When Shawn discovered that Case had moved in she contacted Theron and he eventually admitted that their relationship was homosexual. Shawn then proposed that she keep the girls for four months, giving Theron one night per week of visitation, which she asserted "will allow you the opportunity to sort through some issues while we work with a counselor or mediator to plan for the girls." Theron did not agree and Shawn then filed her petition to modify custody. It appears Shawn's concerns were not based on any specific behavior or conduct on Theron's part that the children might be witness to, other than the fact that he was living in a homosexual relationship. Shawn does not allege that the two men behaved in an inappropriate way in the presence of the children, nor does she allege that their behavior as a gay couple was having a negative influence on the children. Significantly, Shawn does not allege that the children have been harmed as a result of Theron's homosexuality. She simply alleges that his living openly as a homosexual needed to be appropriately explained to the children through the help of professional counseling and a cooperative effort by both parents—not an unreasonable request.

It appears from the record and from the publicity engendered by this case, that at least one of the children and probably both, are aware of Theron's sexual orientation and thus, there is not much point in discussing how it is communicated to the children now. Nevertheless, it is still important to affirm that homosexuality in and of itself, cannot be a circumstance upon which custody can be modified. In his decision, the magistrate judge specifically stated "this Court does not decide the custody and visitation issues on that basis [father's homosexuality]." We accept the magistrate's statement that sexual orientation played no part in his decision to modify custody and will proceed to discuss those reasons articulated by the magistrate as a basis for his ruling.

Theron also raises constitutional issues of equal protection and due process in his brief with regard to the magistrate's ruling and the role his homosexuality may have played in that decision. However, this is a custody dispute involving a number of other issues apart from homosexuality and the magistrate based his decision to modify custody on factors unrelated to sexual orientation; we find nothing in the magistrate's determination that would constitute a constitutional violation.

**B. Other findings**

**1. Theron's Refusal to Communicate With Shawn**

Of the findings made by the magistrate, the most significant finding directly relating to the best interests of the children is Theron's refusal to effectively communicate with Shawn, or indeed, to communicate at all. The magistrate made extensive findings that Theron had discontinued all direct communication with Shawn and would only communicate with her via their attorneys or through a "family message envelope" using the children as couriers.

The magistrate found: "[F]ather told Dr. Corgiat and testified in Court that he could not communicate directly with Mother." One of the material changes in circumstances the magistrate found was "[F]ather's continuing refusal to communicate directly with Mother and to allow her to participate in important communications and decisions regarding the girls." The magistrate further observed:

> Father admitted that he desires no contact with the children's Mother. During his testimony he was visibly angry and his body language appeared to show a strong disliking for her. To this extent Father exhibited a lack of control of his negative feelings for Mother in the presence of the Court. The same or worse is likely outside the courtroom in the company of Mother and/or the children.

The court concluded that "the evidence credibly showed that Mother was willing to work with and communicate with Father for the girls' best interest but Father was not will-

ing." "[Father's] refusal to be in the same room or communicate directly with children's Mother and his refusal to discuss anything with her personally is clearly detrimental to the girls and makes joint custody completely unworkable."

Further, the magistrate found that Theron also refused to attend any counseling when Shawn was present. This is a significant failure where the counseling was not only aimed at addressing how Theron's homosexuality was to be explained to the children but also helping the two parents work together through their anger towards each other for the best interests of the children. The magistrate stated that when the court-appointed counselor had recommended counseling for both parents, "Mother, her counsel, and the court relied on the parties' compliance with this recommendation. Mother complied. Father refused." Dr. Harper, the counselor agreed upon by the parents to conduct this recommended counseling, "testified that Mr. McGriff insisted upon counseling sessions independently and refused any direct communication with Mrs. McGriff, and further that Mr. McGriff presented a 'list of demands' which he insisted must be addressed before any further communication could be considered." The magistrate concluded: "As a result of Father's list of demands, and his refusal to participate and communicate directly with Mother, the counseling recommended by Dr. Corgiat never occurred."

Theron does not directly refute these findings. He admits in his briefing "communication between Shawn and Theron was strained," but he insists the family message envelope was " 'an excellent way' and a helpful method to 'increase the quality and frequency of communication' between the parents." Theron also maintains that he "was interested in finding a way to communicate in an appropriate way with Shawn." This is the crux of his response to the magistrate's findings regarding his refusal to communicate with Shawn. Though Theron maintains in his brief that "joint legal custody requires parents to share decision-making with regard to matters directly related to their co-parenting of their children, such as issues relating to the children's education, health care, recreational activities, and other similar issues," Theron believes essential communication regarding these decisions can be maintained through passing written messages to Shawn by way of an envelope the children carry back and forth to each parent. He does not contest the findings of the magistrate that he refuses to speak with Shawn or to attend counseling with her.

The magistrate judge also commented on Theron's unilateral decision to discuss his sexual orientation with one of the children, in direct contravention of Shawn's wishes. The magistrate found:

> Father's unilateral action in taking the girls to Sue Heng without notice to their Mother and contrary to Dr. Corgiat's recommendations and his subsequent unilateral discussion, excluding Mother, about his lifestyle with [the older child] indicate a lack of disciplined judgment on Father's part and placing the girls needs above his own.

Section 32–717 of the Idaho Code establishes that two of the factors a court must consider in determining what custody arrangement is in the best interest of the child are (c) the interaction and interrelationship of the child with his or her parent or parents, and his or her siblings, and (e) the character and circumstances of all individuals involved. When one parent refuses to communicate with the other in a joint custody setting, where essential decisions involving the care of the children are continually necessary, the best interests of the children are obviously detrimentally affected. It is clear that because Theron refused to communicate with Shawn in any productive way, the magistrate judge was well within his discretion in finding that a joint custody arrangement was not in the best interests of the children. Parenting in a joint custody situation cannot effectively take place where the parents choose to communicate through their attorneys or by utilizing the children as messengers. Theron's refusal to put the interests of his children ahead of his own interests is a clear demonstration of why he is not suited to share custody. When such essential communication is absent and one parent insists on pursuing his or her own interests, it is the

children who bear the unfair brunt of these harmful activities, and it is the role of the courts to fashion a custody arrangement that works in the best interests of the children, not the parents.

## 2. The Shared Custody Arrangement

The magistrate judge also found that a joint custody arrangement where the children spend half of each week with each parent was in itself not in the best interests of the children. There was evidence presented demonstrating that this arrangement had produced undue stress on the children and had resulted in emotional difficulties. There was also evidence that this arrangement had resulted in several confrontations between the parents in front of the children; one in which the younger child was told to choose which parent she wanted to be with.

The magistrate found it appropriate to discontinue this arrangement. We agree the magistrate was presented sufficient evidence to conclude that the mid-week handoff of the children and the current split custody arrangement was not in the best interests of the children and that such a situation necessitated a modification of the custody arrangement.

## 3. The Finding That Shawn Was Better Suited for Custody

At the conclusion of the trial, the magistrate made determinations about the witnesses' credibility and, in consideration of the testimony and evidence offered, found that Shawn was better suited to have physical and legal custody of the children. The magistrate judge specifically found that Shawn was willing to work with Theron for the good of the children while Theron was not. On several occasions, the magistrate found that Shawn was willing to put the girls' interests above her own and to avoid conflict when Theron was not. And, as discussed above, it was Shawn who was willing to communicate with Theron and to improve her relationship with him through counseling while Theron would not do so. Though there is some conflicting evidence in the record and evidence that Shawn was not entirely without fault herself, there is sufficient evidence in

the record supporting the magistrate's conclusion that Shawn was best suited for sole legal and physical custody of the children.

## 4. Additional Findings

Though the magistrate made additional findings pursuant to I.C. § 32–717 considering specifically the factors set forth in that statute, we need not address them, as we agree the findings discussed above are sufficient to uphold the magistrate's decision to modify custody and award legal and physical custody of the children to Shawn.

## VI.

## LIMITATIONS ON VISITATION

■ The magistrate judge ordered that Theron have visitation with the children on alternating weekends and holidays and six weeks during the summer "providing that Father is not residing in the same house with his male partner" during those visits. Theron appeals this restriction, arguing that it is discriminatory against him as a homosexual and is not based on credible evidence to support it. We find that such a restriction was appropriate given the circumstances involving Nick Case in the custody matter.

The magistrate found:

Mother testified that in December 2000, and January 2001, she received several hang-up telephone calls which she reported to the police. She called a number on her caller-ID and it was Nick Case's voice mail. Chandra Evans testified that in mid-March, 2001, a call came to the Mayor's office (where Shawn worked) from someone refusing to identify himself and complaining about Mother and demanding that his complaint be forwarded to the Mayor. Chandra Evans had caller-ID, informed Mother's supervisor, Chad Stanger, advising him of the call and phone number. Chad Stanger testified that the allegations against Mother were completely false. Evans testified regarding a second call from the same caller who was angry with her for giving out his phone number. He threatened her. Father when asked if he believed his partner Nick

Case made the calls, said, "Well, ... they had his number and I talked to him about it". Father testified that he did not want to know if Nick made the call but told him to stop, and said, "Don't tell me if you did it."

In February 2001, the Idaho Falls police advised Mother that a Nick Case had filed a Complaint against her for her driving, "cutting him off." Mother testified that she did not know what vehicle Nick Case was driving and denied the accusation. Her testimony was uncontroverted.

According to the testimony of Chandra Evans, Case was attempting to complain to the mayor that Shawn "took her girls to work and sold Girl Scout cookies, and that she walked the river on city time." However, Chad Stanger, Shawn's supervisor, testified this was usually done on Shawn's break time or with his permission and was not a violation of city policy. In addition, it appears the police only visited Shawn at her home regarding the alleged "cut-off" after Case had called the police a second time, asking why no action had been taken on his complaint.

In his parental evaluation, Dr. Corgiat, the court-appointed counselor, stated: "I would strongly recommend that Nick Case stay out of the relationship between Theron and Shawn. There have been some hostilities that have developed between Nick and Shawn. These are inappropriate and acting upon them will clearly be to the detriment of the children." He also later testified that Case's involvement in the matter had not been helpful.

We have held in the past that it is appropriate for a trial judge to review the living arrangements of a child as part of a review of what is in the best interests of the child and that such a review may include a consideration of persons with whom a parent intends to reside. *Roberts v. Roberts*, 138 Idaho 401, 404, 64 P.3d 327, 330 (2003). In *Roberts*, this Court upheld the trial court's decision restricting the custodial mother's place of residence to a certain geographic area and, in arriving at that conclusion, the trial court considered and based its decision in part on the fact that the mother's fiancé with whom she wished to reside had drug abuse problems and a felony record.

This Court has also held that "[t]he acts and conduct of the custodial parent, resulting in the alienation of the love and affection which children naturally have for the other parent, is a vital and very serious detriment to the welfare of such children and is grounds for modification of the decree with respect to such custody." *Stewart v. Stewart*, 86 Idaho 108, 114, 383 P.2d 617, 620 (1963). This same rule carries equal weight when applied to any other individual who could potentially play an influential part in the development of the children and their relationship with the other parent.

There was sufficient evidence to support the magistrate judge's finding that Nick Case should not be involved in the family relationship with Shawn at the present time, where he had taken vindictive action in attempting to discredit her and create trouble for her at work and with the police. The magistrate judge did not abuse his discretion in ordering that Case not be residing at the home when the children were visiting, as Case's involvement had been shown to be detrimental and to pose a valid danger of alienating the children's affections toward their mother.

## VII.

## ATTORNEY FEES ON APPEAL

■ Theron appeals the magistrate's decision ordering him to assist in paying Shawn's attorney fees on appeal, an order that was made after this Court granted permissive appeal and which Theron thereafter incorporated as an issue on appeal.

■ Upon a motion by Shawn and after a hearing and considering evidence, the magistrate judge determined that Shawn's monthly expenses were greater than her monthly income, that she was unable to pay her attorney fees to defend this appeal, and that she had accumulated a large balance owed to her attorneys at the time of the hearing. The magistrate also found that Theron's monthly expenses were less than his monthly income, and that due to contributions and donations

from friends and supporters, a fund established on a website that assisted in his legal expenses, and the assistance of outside counsel, he was able to pay for his own attorney fees and, in fact, his balance with his attorneys reflected a credit on particular dates. The magistrate accordingly ordered Theron to pay Shawn's attorneys a one-time amount of $750, and then $500 each month thereafter to assist Shawn in paying her attorney fees on appeal. Such payments, the record shows, were meant to assist Shawn in paying approximately half of her attorney fees.

Section 32–704(3) of the Idaho Code allows:

The court may from time to time after considering the financial resources of both parties and the factors set forth in section 32–705, Idaho Code, order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this act and for attorney's fees, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or after entry of judgment. The court may order that the amount be paid directly to the attorney, who may enforce the order in his name.

Section 32–705 establishes:

1. Where a divorce is decreed, the court may grant a maintenance order if it finds that the spouse seeking maintenance:

(a) Lacks sufficient property to provide for his or her reasonable needs; and

(b) Is unable to support himself or herself through employment.

2. The maintenance order shall be in such amounts and for such periods of time that the court deems just, after considering all relevant factors which may include:

(a) The financial resources of the spouse seeking maintenance, including the marital property apportioned to said spouse, and said spouse's ability to meet his or her needs independently;

(b) The time necessary to acquire sufficient education and training to enable the spouse seeking maintenance to find employment;

(c) The duration of the marriage;

(d) The age and the physical and emotional condition of the spouse seeking maintenance;

(e) The ability of the spouse from whom maintenance is sought to meet his or her needs while meeting those of the spouse seeking maintenance;

(f) The tax consequences to each spouse;

(g) The fault of either party.

This Court has ruled:

Pursuant to I.C. § 32–704, the district court has original jurisdiction in determining whether to require one spouse, during the pendency of an appeal from a judgment in a divorce action, to pay to the other spouse such sums as may be necessary for that spouse to prosecute or defend the action. Whether an award should be made, and if so, the amount of the award necessary to pay costs and attorney's fees on appeal, are issues addressed to the sound discretion of the trial court. Although attorney's fees and costs may be allowed on original application in this Court, [i]t is the policy of this court to leave to the district court, under authority of section 32–704 I.C., the making and enforcing of all orders necessary to provide the wife with the means of prosecuting or defending on appeal, and temporary alimony, and to exercise its original jurisdiction only upon a showing that such action is necessary to the exercise of its appellate jurisdiction.

*Wilson v. Wilson,* 131 Idaho 533, 537, 960 P.2d 1262, 1266 (1998). In order for a trial court to award attorney fees established by I.C. § 32–704(3), it is necessary that the court considered the factors set forth in I.C. § 32–705. *Jensen v. Jensen,* 128 Idaho 600, 607, 917 P.2d 757, 765 (1996). Additionally, in *Jensen* this Court found that a disparity in income is sufficient to support a magistrate's conclusion that the party with the higher income should pay a share of the other party's attorney fees under I.C. § 32–704. 128 Idaho at 606, 917 P.2d at 763.

The magistrate's decision reflects that he was aware of the need to consider the factors in I.C. § 32–705, and that he did consider in depth the financial circumstances of each

party in arriving at his conclusion. The magistrate's decision shows that the court recognized that though the incomes from employment for each of the parents were somewhat similar, Shawn was not able to make ends meet with her and the children and pay her attorney fees at the same time. Shawn owed her attorneys over $8000 at the time the trial court made its findings. The evidence also showed that due to outside contributions and assistance given to Theron, he was able to establish a savings account with over $4000 and he had a credit of over $800 with his attorneys at the time the trial court made its findings of fact. As such, there was adequate evidence presented to demonstrate there was a disparity in incomes relating to the parties' abilities to carry on this appeal and, accordingly, the magistrate judge was within his discretion in ordering Theron to pay a portion of Shawn's attorney fees.

■ Theron claims that the magistrate's order granting attorney fees on appeal to Shawn was contradictory to his decision after the modification hearing denying attorney fees to both parties. However, subsequent changes in the parties' circumstances following the trial merited the new ruling. First, Shawn gained physical custody of the children, a circumstance which, though aided by Theron's payment of child support, still put her in a different monetary position than at the trial. Second, the additional income Theron received aside from his employment in the form of contributions to his legal cause was properly considered by the magistrate and created a disparity in income sufficient to base a partial award of attorney fees on appeal to Shawn.

■ Theron also appeals the manner in which the magistrate awarded attorney fees to Shawn, arguing that an award of a one-time payment of $750 and an ongoing monthly payment of $500 to Shawn's attorneys is an abuse of the magistrate's discretion. We agree. Though the magistrate was within his discretion in awarding attorney fees to Shawn, he should have determined what he believed would be a reasonable amount to be paid by Theron according to I.C. § 32–704(3), instead of leaving the amount to be paid open-ended. Accordingly, the attorney fee

award must be vacated and remanded back to the magistrate for a determination of what a reasonable attorney fee would be to be awarded for Shawn.

## VIII.

## CONCLUSION

We agree the magistrate judge had continuing jurisdiction in this case to hear matters of child custody and could reset the petitions to modify for hearing, particularly where neither party objected. The magistrate judge's determination of factors demonstrating a material and permanent change in circumstances are supported by substantial competent evidence in the record. There were no allegations here that the children had been harmed by Theron's homosexuality, and the magistrate judge did not rely on that factor in his custody determination. The magistrate was within his discretion in awarding Shawn sole legal and physical custody of the children where the record contains substantial and competent evidence that Theron's actions toward Shawn, as well as the difficulty of the current custodial arrangement, were detrimental to the children's best interests. The magistrate judge also did not abuse his discretion in ordering that Theron's partner not reside at the home when the children were present for visitation. Finally, the magistrate was also within his discretion in ordering Theron to assist Shawn in paying her attorney fees, although he erred in making it an open-ended award without any determination about what a reasonable attorney fee would be. We award costs on appeal to Respondent.

Chief Justice SCHROEDER and Justice BURDICK concur. Justice EISMANN concurs in the result.

Justice KIDWELL, dissenting.

A review of the record, the pleadings and oral argument before this Court make it clear that Theron's sexual orientation was wrongfully taken into consideration by the lower court and now the majority opinion. This should not be the law of Idaho and is

undesirable public policy. Therefore, I respectfully dissent.

The Idaho law regarding custody modification is well established. Custody may not be modified unless there is a material, permanent and substantial change in circumstances that indicate that modification is in the best interests of the children. *Tomlinson v. Tomlinson,* 93 Idaho 42, 47, 454 P.2d 756, 761 (1969). Shawn asserts that Theron's sexual orientation is a substantial change in circumstances. Her petition states, "events have occurred with respect to the Defendant's intimate relationship with a person of the same sex which have completely changed the circumstances, such that it is no longer in the best interests of the girls that they spend one-half of the overnights each week with the Defendant." Although it is clear that Shawn's petition is based on Theron's homosexuality, the majority upholds the magistrate's decision, which clearly appears to take Theron's homosexuality into consideration. Immediately after stating that homosexuality did not play a role in its holding, the magistrate stated, "However, [Theron's] decision to openly co-habit with Nick Case, his partner, is a change in circumstances which will generate questions from the girls and their friends regarding their conservative culture and morays (sic) in which the children live."

The magistrate sets forth several reasons why its decision to review custody was warranted, including the following, which were not included in Shawn's petition:

- The girls' current difficulty and adjustment in changing residence each Wednesday;
- Theron's impending move and change of schools for one of the children; and
- Theron's continuing refusal to communicate directly with Shawn and to allow her to participate in important communications and decisions regarding the girls.

The majority interestingly argues that the Court is not confined by the allegations of the petition when deciding what custody arrangement is in the best interests of the children, so it is insignificant that these reasons were not included in the petition. However, it is unusual and cause for legal concern, that the magistrate reached for reasons to help Shawn succeed in her claim when the primary reason stated in her petition to modify custody, homosexuality, is not a legally permissible consideration.

In addition to giving Shawn primary custody of the girls, the majority upholds the decision to limit Theron's visitation "provided [Theron] is not residing in the same house with his male partner." If Theron's sexual orientation is not a factor, it is disingenuous that Theron may only exercise his visitation rights if he does not live with his male partner. The majority somewhat incredulously states that the limitation has nothing to do with Theron's homosexuality, rather it is a consequence of hang-up phone calls allegedly made by Theron's partner to Shawn.

Although courts are not bound by expert testimony, it is very persuasive in cases of this nature that the district court-appointed custody evaluator, Dr. Corgiat, recommended that the approximate 50–50 shared custody arrangement remain unchanged. He noted that, "[B]oth children have a positive relationship with each parent and with each other. Both parents have shown positive nurturing, and have spent quality time in a variety of good activities with the girls."

While the determination to modify child custody is left to the sound discretion of the trial court, this Court may substitute its judgment and discretion for that of the trial court when the record reflects a clear abuse of discretion. *Biggers v. Biggers,* 103 Idaho 550, 555, 650 P.2d 692, 697 (1982). An abuse of discretion can occur if the trial court misapplies the law or fails to reach its decision by an exercise of reason. *Sun Valley Shopping Center v. Idaho Power,* 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991). The record reflects an abuse of discretion since Theron's sexual orientation was wrongfully taken into consideration; therefore, the decision of the magistrate should be reversed.