# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 50875

In the Interest of: JOHN DOE I, JANE DOE )
I, JOHN DOE II, JOHN DOE III, AND JANE )
DOE II, Juveniles Under Eighteen (18) Years )
of Age. )
------------------------------------------------------ )
STATE OF IDAHO, DEPARTMENT OF )
HEALTH AND WELFARE )
)
   Petitioner-Respondent, )
)
v. )
)
JOHN DOE (2023-25), )
)
   Respondent-Appellant. )
_____ )

Boise, September 2023 Term

Opinion filed: November 3, 2023

Melanie Gagnepain, Clerk

---

Appeal from the District Court of the Sixth Judicial District of the State of Idaho, Bannock County. Anson Call, Magistrate Judge.

The magistrate court's order is affirmed.

Price Legal Care, PLLC, Pocatello, attorneys for Appellant. James Price submitted argument on the briefs.

Department of Health and Welfare, Pocatello, attorneys for Respondents. Jason Chandler submitted argument on the briefs.

_____

BEVAN, Chief Justice.

This case involves parents who were living separately and their five children. It proceeded to the legal system because of concerning reports of physical abuse and neglect brought to the attention of the Idaho Department of Health and Welfare ("Department") that resulted in a court-ordered investigation. The child protection case began in February 2023 as a protective

1

supervision[1] case. Nearly three months later, the magistrate court ordered that the children be removed from the home and placed in the legal custody of the Department.

John Doe (Father) appeals the magistrate court's order removing his five children from the parents' custody and temporarily placing the children in the legal custody of the Department. Father asserts that the magistrate court's order failed to contain detailed written findings as required by Idaho law, that the order was not supported by substantial and competent evidence, and that the magistrate court's actions violated Father's fundamental rights to the care and custody of his children. We affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Jane Doe (Mother) and Father are married but have been separated since February 2023 and live in separate households. Mother and Father have five children, ranging in ages from fifteen to eight: Oldest Son, Oldest Daughter, Middle Son, Youngest Son, Youngest Daughter.

Before the children were placed in protective custody, Mother and Father had extensive contact with the Department. The Department received a referral on December 15, 2020, over concerns related to a fight between Mother and Father, in which Father allegedly put a gun to his head and refused to allow Mother access to their children. On March 9, 2022, the Department received a report that Father held Oldest Son down and yelled at him. The Department received another referral on September 30, 2022, alleging that Youngest Daughter was often hungry and not permitted to eat freely. On October 24, 2022, the Department was alerted after Father threatened to put Oldest Son "through a wall."

In January and February 2023, the Department conducted six court-ordered investigations involving claims of physical abuse by Father and Mother against the children.[2] At the initial contact with Mother and Father, the Department spoke to Father over the phone. Father reported concerns about Mother's mental health. Father sent the Department screenshots of text messages between him and Mother. One message, sent to Father in January 2023, was from a contact saved in his phone as "Mother's name," that stated: "Just kill me already I'm done . . . Tell the kids I love them

---

[1] "'Protective supervision' is a legal status created by court order in a child protective case whereby the child is in the legal custody of his or her parent(s), guardian(s) or other legal custodian(s), subject to supervision by the department." I.C. § 16-1602(35).

[2] The Department received twenty-three reports of concern against Mother and Father with eleven assignments for assessment involving domestic violence, physical abuse, educational neglect, and general neglect. One report had been substantiated against Mother; Father had no prior substantiations.

2

bye." Father responded to this message stating, "Answer your phone please . . . So you're threatening to kill yourself if I don't drop the order? Answer your phone, this isn't funny."

Father filed several petitions for civil protection orders ("CPO") against Mother on behalf of all the children, one of which was in late February 2023. At the hearing on the petition, Father introduced a recording from Mother, where she made statements such as "Shut up before I smack you." Father alleged this statement was made to Oldest Son. Later in the recording, Mother stated, "Crazy person trying to kill people." Father also reported that he told Oldest Son he was going to "lay him out" if Oldest Son hit Mother.

On February 27, 2023, the Bannock County Prosecutor's Office filed a petition under the Child Protective Act and requested that the children be placed under the protective supervision of the Department. In the adjudicatory report of investigation, filed by the Department on March 17, the Department noted that Mother had experienced trauma related to prior domestic violence by Father against her during their marriage. Although Mother did not disclose any mental health diagnosis, the Department explained that collateral contacts reported concerns about Mother's mental health. Related to Father, the Department's report revealed that Father displayed PTSD symptoms from his military service in Iraq. The Department also noted several of Father's prior convictions, including a 2009 charge for misdemeanor domestic battery/assault with an enhancement for a child present, that was pleaded down to disturbing the peace. In 2019, Father was charged with felony injury to child, which was later dismissed. Both Father and the children reported that Father disciplined the children by yelling, sending them to their room, and spanking them.

Soon after, the magistrate court appointed a guardian ad litem ("GAL"). Following an adjudicatory hearing a few days later on March 27, the magistrate court placed the children under the Department's protective supervision, with Mother and Father retaining custody of the children. The Department, Mother, and Father worked to create a visitation plan for the parents since they lived in different households. That said, on April 8, Mother would not allow two of the children to visit with Father, as required by their agreement, and Father contacted law enforcement. Police responded, but ultimately told Father he would need to resolve the issue through the courts.

On April 18, the magistrate court held a case plan hearing. In its proposed case plan, the Department noted that there were no safety concerns in either Mother's or Father's home to limit the length or frequency of visitation with either parent. The Department explained in that plan that

3

it was "in the best interest of the children for the parents to identify a schedule[,]" which should be done before leaving the hearing. At the hearing, the magistrate court interviewed each child. During those interviews, the children reported fighting with Mother and one instance of physical contact. Following the interviews, the magistrate court gave the parents general tasks to complete, including enrolling the children in school, abstaining from any physical discipline, and not restricting access between the children and the other parent. The magistrate court ordered visitation on a three-day rotating basis, beginning with Mother on April 20. The order also permitted Oldest Son, who is autistic, the option to spend time with either parent if he became overstimulated.

On April 22, while the children were with Mother, the children texted and called Father to report "fighting throughout the day." That night, Father contacted law enforcement, requesting a welfare check after receiving a text from Oldest Daughter that Mother had taken Oldest Daughter's phone. When law enforcement responded to Mother's residence, the children were sleeping. Law enforcement spoke with Mother and asked about the children having phones. Mother told police that the children were allowed to have phones, but Father gave an extra phone to Oldest Daughter, which Mother took away when it was bedtime.

On May 1, 2023, the magistrate court entered a case plan order that would: (1) require visitation to proceed with Mother for three days and then Father for three days; (2) permit Oldest Son to visit the home of the other parent if he became overstimulated; (3) restrict both parents from involving the children in court proceedings; (4) require the children to be enrolled in school; (5) prohibit physical discipline; and (6) mandate that neither parent restrict the other from access to the children.

On May 2, Father again received texts from the children while in Mother's care. The children told Father that Mother was threatening to hurt herself. Father contacted law enforcement again after receiving a text from one of the children alleging that Mother was "going nuts." Law enforcement advised Father that because police had responded before to a welfare check for a similar incident, Father needed to provide his court paperwork and the text message he had received. They also informed Father that they would conduct a welfare check, but "would not allow him to use his children as collateral in an ongoing child protection case and civil divorce to his advantage." As officers reviewed the case plan order that Father sent, Father reported to dispatch that one of the children had sent him a text message alleging Mother planned to commit suicide. Police went to the home and found Mother and three of the children crying and upset.

4

Mother denied having suicidal ideations, and law enforcement did not believe the children were at risk. After law enforcement told Father that a welfare check had been completed, Father asked the status of Mother's mental health. Law enforcement declined to release that information, which made Father upset. Law enforcement reiterated that the children were safe and declined to release any other information.

Following the case plan order, Father filed for another CPO, which was granted on May 8, preventing Mother from having contact or visitation with the children. On May 11, the GAL filed a review report. In the report, the GAL worried about Father, including a concern that Father "has spent the entire time contacting various people trying to make himself look like the best parent and trying to make [Mother] look bad." The GAL summarized by explaining that the "children are still being manipulated by the parents and the situation. Even though there is no proof of what is being said in the home[,] the constant calling of law enforcement and the inability to exchange custody without a fight is taking a toll on the children." The GAL recommended that the children be placed in the legal custody of the Department so that the "children no longer have to be in the middle[.]"

The next day, the Department filed its progress report. The Department's report echoed some of the same concerns the GAL had raised, explaining that both parents "have demonstrated they were unable to manage their personal and marital conflict in a way that ensured stability and safety for the children." The report also stated that the "children have been exposed to their parents' domestic violence and unhealthy communication and interactions." Even so, the report clarified that Father "has demonstrated his desire to safely parent all his children through open communication…[Father] has demonstrated his ability to meet the children's physical, emotional, and medical needs…[and] reported he is participating in counseling[.]" The Department's report recommended that the case remain as a protective supervision case.

On May 17, the magistrate court conducted a status hearing. The Department reiterated that it did not have any imminent safety concerns for the children but recommended that the parents use an app to communicate and coordinate transfers so that text messages would be recorded and could be reviewed by the Department and the GAL. The GAL generally disagreed with the Department's recommendation, labeling the case as a "classic example of the power-and-control wheel." Instead, the GAL requested that the children be placed in foster care. Counsel for Oldest

Son and Oldest Daughter[3] told the magistrate court that the young children were not displaying concerns but suggested the magistrate court interview the children. The magistrate court did not interview the children at that hearing.

After hearing from the parties, the magistrate court summarized the latest CPO petition and law enforcement reports and placed the children in the temporary legal custody of the Department, which then placed them with their paternal grandmother pending a redisposition hearing, explaining, "I can't make heads or tails of what's going on here." The court then scheduled a redisposition hearing for May 19. At the redisposition hearing, the magistrate court heard testimony from four witnesses: Father, the GAL, the case worker, and a counselor who had seen the children and father. Following that testimony, the magistrate court discussed concerns about the children and identified the factors the court had to weigh in making its decision. The magistrate court made verbal findings of fact, ultimately continuing the placement of the children in the legal custody of the Department but approving Oldest Son for extended home visits with either parent at the Department's discretion. The magistrate court later issued a written redisposition order, from which Father filed a motion for permissive appeal. The magistrate court granted Father's motion.

## II.    STANDARDS OF REVIEW

A party to a Child Protective Act proceeding may bring a direct permissive appeal to this Court from the orders and decrees specified under Idaho Code section 16-1625(1). "The Supreme Court reviews the magistrate court record to determine whether there is substantial, competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings." *Idaho Dep't of Health & Welfare v. Doe*, 151 Idaho 300, 303, 256 P.3d 708, 711 (2011) (quoting *Losser v. Bradstreet*, 145 Idaho 670, 672, 183 P.3d 758, 760 (2008)).

"Decisions regarding child custody are committed to the sound discretion of the magistrate, and the magistrate's decision may be overturned on appeal only for an abuse of discretion." *Nelson v. Nelson*, 144 Idaho 710, 713, 170 P.3d 375, 378 (2007) (quoting *McGriff v. McGriff*, 140 Idaho 642, 645, 99 P.3d 111, 114 (2004)). "An abuse of discretion occurs when the evidence is insufficient to support a magistrate's conclusion that the interests and welfare of the children would be best served by a particular custody award or modification." *Id.* (quoting *McGriff*, 140 Idaho at

---

[3] Oldest Son and Oldest Daughter were appointed counsel shortly after the petition was filed.

645, 99 P.3d at 114). "Appellate courts, however, are not permitted to substitute their own view of the evidence for that of the trial court, or to make credibility determinations." *Id*.

"When reviewing the trial court's findings of fact, the appellate court will not set aside the findings on appeal unless they are clearly erroneous such that they are not based upon substantial and competent evidence." *Id*. (quoting *Reed v. Reed*, 137 Idaho 53, 56, 44 P.3d 1108, 1111 (2002)). "If the findings of fact are based on substantial evidence, even if the evidence is conflicting, they will not be overturned on appeal." *Id*. (quoting *State v. Hart*, 142 Idaho 721, 723, 132 P.3d 1249, 1251 (2006)). "When reviewing the trial court's conclusions of law, however, this Court exercises free review of the court's decision to determine whether the court correctly stated the applicable law, and whether the legal conclusions are sustained by the facts found." *Id*. (quoting *Hart*, 142 Idaho at 723, 132 P.3d at 1251).

## III. ANALYSIS

Before we discuss the merits of Father's arguments on appeal, we first address an issue the Department raised in its brief regarding this Court's appellate jurisdiction. The Department argues that this appeal should be denied because the redisposition order is not a final judgment. We recently discussed this question in *IDHW v. Doe*, 171 Idaho 692, 525 P.3d 730, 737 (2023), noting "that the 'final judgment' language used in [Idaho's Appellate] rules does not appear to be consistent with the language used in Idaho Juvenile Rule 49 and Idaho Code section 16-1625(1)." After referring the matter to the Child Protection Committee for additional study, this Court decided, in the interim, to amend Idaho Appellate Rules 11.1(b) and 12.1(a), as well as Idaho Rule of Civil Procedure 83(a)(1), to allow a party to a Child Protective Act proceeding to bring a direct permissive appeal from the orders and decrees identified in Idaho Code section 16-1625(1).[4] A redisposition order is one such order. *See* I.C. § 16-1625. As a result, we accept Father's appeal and consider the merits.

A. **The magistrate court failed to provide detailed, written findings of fact, but the error is harmless given that its verbal findings are supported by substantial and competent evidence.**

Father first makes two interrelated arguments, maintaining that the magistrate court's written findings of fact were not detailed as required by statute and, separately, that the court's

---

[4] *See In re: Permissive Appeals in Child Protective Act Proceedings*, ISC ORDER (Aug. 31, 2023).

verbal findings of fact are unsupported by substantial and competent evidence. For the reasons discussed below, we disagree with Father's arguments and affirm the magistrate court's order.

    1. *The magistrate court's verbal findings of fact.*

Father argues that the magistrate court's verbal findings were not supported by substantial and competent evidence. While Father concedes that the magistrate court made "several comments," he maintains that the magistrate court did not "identify" its remarks as findings and spoke only briefly before summarily concluding that it would be contrary to the welfare of the children to remain in Mother's or Father's home, and it was in the best interests of the children to vest legal custody with the Department. We disagree with Father's characterization of the magistrate court's ruling.

At the redisposition hearing, the magistrate court heard testimony from several witnesses, including the GAL assigned to the case and the case manager with the Department. During direct examination, the GAL expressed concerns that arose when trying to communicate with Father about the children's welfare:

> I felt like it was -- like he was directing [the conversation], putting [it] back on me, leave his kids alone; he would do the parenting. Because I'd ask him to do it, and he said no, he wasn't going to. I said, "Then I will ask -- talk to them when I see them about appropriate texts, appropriate language." And then he became combative, abusive, manipulative in that thread.

The GAL was also asked about her report, in which she stated that "Each child expressed concern about food in the home of their father." The GAL's report also described what she characterized as "trauma" each time there was an exchange between parents. On cross-examination, the GAL clarified that "trauma" referred to the children's repeated exposure to law enforcement. When the Department's case manager testified, she reiterated the concerns the GAL had raised about the children's repeated exposure to police in the context of having a safety plan:

> And it is damaging to have the police called once, twice, three times a month. And so we just need someone else that the kids are familiar with, that the family's familiar with that is appropriate, that can provide some feedback and help the parents in those situations de-escalate so that it isn't outside like law enforcement or something else.

When asked whether the case manager believed the behavior in the case warranted vesting the children in the Department's legal custody, she responded:

> I -- I see -- I see the reasons and the justification for them being placed in legal custody. It was not my recommendation at the time of the hearing.

8

. . . .

Just -- I recommend that they -- they -- I believe the parents have a lot of stuff we need to figure out and work through. And we can do that -- if the kids stay with grandma through legal custody and in foster care, we can do that.

I also believe that with some real dedicated conversations and more open communication they can safely parent their children at home.

According to the magistrate court, the Chubbuck Police Department responded to Mother's house the night of April 22 after Father called requesting a welfare check on the children. Police responded to the house where they found Mother and children asleep in bed. On the evening of May 2, Father called the Chubbuck Police Department and requested a welfare check again. When Mother answered the door, she told law enforcement that she was having a hard time with the children and advised that Father "was using her kids against her and she had been trying to get her children to trust her." After concluding that Mother was not suicidal, officers contacted Father advising him of the outcome of the welfare check. Father was not happy with the amount of information that law enforcement provided because law enforcement would not disclose Mother's mental status, and he demeaned the officer: "If you would stop thinking with your dick because you think [Mother] is cute or something."

After hearing from the witnesses and reviewing reports from the GAL and the Department, the magistrate court reviewed the evidence, which demonstrated Father's aggression toward Mother in the presence of the children, and made factual findings based on the contested information presented to the court. Indeed, as detailed in the magistrate court's oral findings, the children experienced considerable turmoil and trauma when spending time with either parent. The magistrate court's remarks extend through fourteen pages of transcript. In part, the magistrate court's findings of fact explained:

Here's what I see is the big picture: The picture -- and I read directly from the civil protection order petition on Wednesday some of the things that I'd seen in there that were reported that [Mother] had allegedly said and that had happened in her home. And they're outrageous if they're true, what has been said to and in front of the kids. And that clearly imposed trauma on the kids if that's what happened.

. . . .

There's clearly evidence that there's conflict that goes on when the kids are at [Father's] house. I don't know that it's constant. When you hear [Father] talk about it, it sounds like it's constant; that he's getting texts and calls all day every day that the kids are there; that is what it seems like, that there's conflict going on. Not all

9

day every day. He said he doesn't hear from all the kids every time, but at times that that gets pretty severe.

. . . .

The other part that I have to look at is, like I said, every individual instance of [Father] reaching out to law enforcement or filing a civil protection order on its own seems like it could potentially be reasonable. I granted the temporary order on this last one because when I read what was included in the petition, I didn't see another way to go around that and not do it based on those allegations.

But then we sit here today and [Father] says, "No. I don't need a civil protection order." And I don't know if he says that because he thinks that's what I want to hear or if he says that because he thinks that's what everybody else here wants to hear, but it's not the first time that that's happened. We have a history of four or five civil protection orders, according to [Father's] testimony, that have been filed and have existed or gone away. I think there was an instance more recently with this court where he attempted to pursue that more actively. But there's a history of these civil protection orders just not being followed through with.

. . . .

I can't ignore the fact that there's a pending charge for attempted strangulation. I don't know if it happened or didn't happen. I wasn't there and the case hasn't been adjudicated yet, so I can't make a decision on that it did or didn't happen. But the kids are certainly caught up in the middle of a domestic violence allegation, and a felony domestic violence allegation at that, that is causing them trauma. And so that's something that they're having to deal with.

. . .

So based on those factors that I'm required to consider, to what extent there are factors, but the rules of the things I'm required to consider with respect to the best interests of the children, what would be contrary to their welfare and whether the department's [sic] made reasonable efforts, all these factors apply to those things and the things I've had to consider.

. . . .

So at this time I do find that it's contrary to the welfare of the children to be returned home at this time. I find it's in their best interest to remain in the legal custody of the Department of Health and Welfare and that the department's [sic] made reasonable efforts to prevent placement in foster care. The department continues to do so.

On appeal, Father points to a series of facts to suggest that the magistrate court abused its discretion in finding that it was contrary to the welfare of the children to remain in his home. From Father's perspective, some of those facts include that Father acted responsibly when he: (1) sought a CPO to keep the children from returning to Mother until the situation was clearer; (2) took the children to a counselor to help them work through their feelings and stress; (3) encouraged the

10

magistrate court and the Court Appointed Special Advocate ("CASA") to speak with the children; and (4) ensured the children's needs were met and that the children felt safe while there.

Father's account of these scenarios, however, merely asks "this Court to disregard the function of the trial court—weighing evidence." *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007). We will not do so. "It is well established that appellate courts in Idaho do not reweigh evidence." *Id.* (citing *State v. Doe*, 143 Idaho 383, 388, 146 P.3d 649, 654 (2006)). "Instead, we defer to the trial court's unique ability to 'accurately weigh the evidence and judge the demeanor of the witnesses' and take into account the trial court's 'superior view of the entire situation.'" *Id.* (quoting *Doe v. Roe*, 133 Idaho 805, 809, 992 P.2d 1205 1209 (1999)). "Findings are competent, so long as they are supported by substantial, albeit possibly, conflicting, evidence." *Roe v. Doe*, 142 Idaho 174, 177, 125 P.3d 530, 533 (2005) (quoting *Roberts v. Roberts*, 138 Idaho 401, 405, 64 P.3d 327, 331 (2003)). "Substantial, competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Doe I*, 164 Idaho 883, 888, 436 P.3d 1232, 1237 (2019) (quotation marks omitted) (quoting *Doe v. Doe*, 150 Idaho 46, 49, 244 P.3d 190, 193 (2010)). The record before the magistrate court here contains sufficient evidence that could lead a reasonable person to conclude that vesting legal custody of the children with the Department was in the children's best interest.

While we decline to usurp the magistrate court's role in weighing evidence, we note that Father's account of events is unsupported by the record. For example, Father characterizes his petition for a CPO as his intent "to keep the children from returning to Mother's home until things could get sorted out." But Father did not limit his filings to a *single* CPO; rather, he *often* filed CPOs to prevent the children from seeing their mother. Father would then move to dismiss the orders once he had strategically benefited by preventing the children from seeing their mother. Indeed, as the magistrate court pointed out, Father failed to explain how the situations were so dangerous as to warrant a CPO one moment, but warrant dismissal the next. Other witnesses who testified, as recognized by the magistrate court, noted that frequent interference with Mother's access to the children had a significant effect on Mother's ability to establish a relationship with the children. While there is conflicting evidence about some of the other facts that Father recounts, the magistrate court found it was contrary to the welfare of the children to remain at Father's home. This conclusion was based on substantial and competent evidence consistent with Idaho Code section 16-1623.

11

Whether Father believes that the children should have remained in protective custody is not the pertinent question. Our sole focus in this appeal is whether there was substantial and competent evidence that "a reasonable mind might accept as adequate" to support the magistrate court's decision to vest legal custody with the Department. We conclude that there was. We therefore hold that the magistrate court's verbal findings were supported by substantial and competent evidence.

2. *The magistrate court's written findings of fact.*

Father next argues that the magistrate court failed to make detailed written findings under Idaho Code sections 16-1623 and 16-1919 and Idaho Juvenile Rule 41. Relatedly, Father maintains that substantial and competent evidence supported the children remaining under protective supervision. The Department responds by arguing that the magistrate court's written findings of fact and conclusions of law were sufficient, and the court's findings were supported by substantial and competent evidence.

Under Idaho Code section 16-1623, the magistrate court is required to make detailed written findings based on facts in the record:

> (1) Where the child has been placed under the protective supervision of the department pursuant to section 16-1619, Idaho Code, the child may be removed from his or her home under the following circumstances:
>
> . . . .
>
> (3) When a child under protective supervision is removed from his home pursuant to subsection (1)(a) or (b) of this section without a hearing, a redisposition hearing shall be held within forty-eight (48) hours of the child's removal from the home, except for Saturdays, Sundays and holidays. At the hearing, the court shall determine whether to vest legal custody in the department or other authorized agency pursuant to section 16-1619(5)(b), Idaho Code. When a child under protective supervision is removed from his home pursuant to subsection (1)(b) of this section and the facts supporting the removal are presented to the court at a hearing, the hearing at which the court orders the child's removal is the redisposition hearing.
>
> (4) In determining whether to vest legal custody in the department or other authorized agency, the court shall consider any information relevant to the redisposition of the child, and in any event *shall make detailed written findings based upon facts in the record* as required by section 16-1619(6), Idaho Code.

I.C. § 16-1623(1), (3)–(4) (emphasis added).

Under Idaho Code section 16-1619(6), the magistrate must also make "detailed written findings" if it "vest[s] legal custody in the department or other authorized agency[.]" Separately,

12

Idaho Juvenile Rule 41 obliges the court to "make a written, case-specific finding that remaining in the home is contrary to the welfare of the child, or, in the alternative, removal from the home is in the best interest of the child." I.J.R. 41(f).

On appeal, Father argues that paragraph 6(b) of the redisposition order makes the conclusory determination that remaining in the home was contrary to the welfare of the children and that it is in the children's best interest to be placed in the custody of the Department. Father also points to the order's language suggesting that the magistrate court's findings are based on "the information in the affidavit(s) in support of the motion for removal and redisposition, that has been filed in this case, and is incorporated in this decree by reference." According to Father, however, there was no motion for removal and, therefore, there was no affidavit in support of that motion.

The plain language of Idaho Code section 16-1623 requires courts to issue detailed written findings when determining whether to vest legal custody of children in the Department. According to the Department, incorporating evidence by reference constitutes sufficient written findings. Indeed, the Department points to this Court's decision in *Matter of Doe*, where we explained:

> In the magistrate court's written findings of fact, it referred to and incorporated by reference an "Adjudicatory/Disposition Report of Investigation" to support its decree placing Child in the Department's custody. This report, however, is not contained in the record before us. Because Father brought this appeal and was responsible for presenting the record in this appeal, we assume information not provided supports the magistrate court's findings of fact and conclusions of law.

169 Idaho 328, 341, 495 P.3d 1016, 1029 (2021).

Similar to *Matter of Doe*, the magistrate court's written findings of fact incorporated by reference the "report of [the GAL], dated 5/11/2023, and the report of [the case manager], dated 5/12/2023," as well as earlier testimony. Relating to the best interests of the children, the written order also incorporates by reference "information in the affidavit(s) in support of removal and redisposition, that [have] been filed in this case . . . ." Among other findings, the reports from the GAL and the case manager identify concerns about the children remaining in Father's custody. The case manager's report, which she testified about at the redisposition hearing, discussed the children's exposure to their parents' domestic violence and ongoing concerns related to education negligence. The GAL's report raised concerns about a power struggle between the parents, with the children in the middle. The GAL also noted that Father was requesting unwarranted welfare checks from the Chubbuck Police Department to interfere with the children's visitation with

13

Mother. The magistrate court also heard testimony at the status hearing on May 17 and the redisposition hearing on May 19, which was incorporated by reference into the redisposition order.

Father points out that the magistrate court explained its findings in the redisposition order were based on "the information in the affidavit(s) in support of the motion for removal and redisposition[.]" As Father notes, no affidavits directly supported the motion. We agree with Father that the redisposition order does not contain detailed findings of fact, but we ultimately conclude that this does not constitute reversible error.

We recently addressed what constitutes a "finding of fact" and explained that a statement that merely recites portions of the record which could be used in support of a finding is not a "finding of fact":

> "A finding of fact is a determination of a fact supported by the evidence in the record." *Crown Point Dev., Inc. v. City of Sun Valley*, 144 Idaho 72, 77, 156 P.3d 573, 578 (2007) (citing BLACK'S LAW DICTIONARY 284 (2d Pocket ed. 2001)). A statement that "merely recite[s] portions of the record which could be used in support of a finding" is not a finding of fact. *Crown Point Dev., Inc.*, 144 Idaho at 77, 156 P.3d at 578.

*Searle v. Searle*, 162 Idaho 839, 846, 405 P.3d 1180, 1187 (2017).

The magistrate court's redisposition order was a check-box style mandatory form authorized by this Court. As for child custody and the best interest of the children, the Order stated:

6. **Custody of the child(ren), best interest of the child(ren).**

☒   Custody to IDHW
a. This child(ren): [Does] are placed in the legal custody of IDHW. The date the child(ren) entered foster care is May 17, 2023.
☒   While in IDHW custody, the child(ren) may travel out-of-state for a period of up to 3 days, in the company of an adult and consistent with IDHW policies and regulations, for health care services, educational or recreational opportunities, or other routine purposes.
b. It is contrary to the welfare of the child(ren) to remain in the home. It is in the best interest of the child(ren) to be placed in the custody of IDHW. The court makes this finding based on:
☒   the information in the affidavit(s) in support of the motion for removal and redisposition, that has been filed in this case, and is incorporated in this decree by reference.

With respect to reasonable efforts to prevent removal of the children, the order stated:

7.   **Reasonable efforts to prevent removal of the child(ren).**
a. Efforts

14

☒     IDHW made reasonable efforts prior to placement of the child(ren) in shelter care to eliminate the need for shelter care but those efforts were unsuccessful.

☒     IDHW made reasonable efforts to eliminate the need for shelter care but was not able to safely provide preventative services.

☒     IDHW made reasonable efforts to temporarily place the child(ren) with related persons but those efforts were unsuccessful.

b. Basis

The court makes this finding based on:

☒     the report of [GAL], dated 05/11/2023, and the report of [Case Worker], dated 05/12/2023, that has been filed in this case, and is incorporated in this order by reference.

☒ testimony.

The redisposition order entered by the magistrate court does not comply with the detailed written findings requirement of Idaho Code section 16-1623(4). Rather than setting forth factual findings, the form merely incorporates by reference certain portions of the record (e.g., the references to affidavits, reports, and "testimony"), which could support a factual finding. Under *Searle,* these evidentiary references do not suffice as "findings of fact."

Having made this determination, the failure to comply with the law is not the failing of the magistrate court. The mandatory form is inadequate. To that end, we refer the form redisposition order (and form adjudicatory decree which contains similar incorporation language) to the Child Protection Committee and request that the Committee make proposed revisions to these forms so that they accurately reflect the "detailed written findings" requirements of Idaho Code section 16-1619 and section 16-1623.

As a result, while we agree with Father that the redisposition order does not contain adequate written findings of fact, we do not agree that this constitutes reversible error. We explained in *Jasso v. Camas Cnty.*, 151 Idaho 790, 794-95, 264 P.3d 897, 891-92 (2011) (discussing *Evans v. Teton Cnty.*, 139 Idaho 71, 73 P.3d 84 (2003)), that under the Local Land Use Planning Act, a reviewing court may overlook otherwise inadequate findings and conclusions if the record contains substantial and competent evidence to support the decision-maker's findings and conclusions. We apply similar reasoning here for two reasons. First, because the magistrate court explained the reasons for its decision in detail on the record following the receipt of testimony from multiple witnesses, we may overlook the otherwise inadequate findings and conclusions of the magistrate court's form order and rely on that substantial evidence. Second, because federal

15

regulations governing Idaho's foster care system permit court transcripts to be used as acceptable documentation of judicial determinations of the best interest of the children and reasonable efforts to eliminate the need for shelter care, we likewise uphold the magistrate court's decision here. *See* 45 C.F.R. § 1356.21(d)(1) ("If the reasonable efforts and contrary to the welfare judicial determinations are not included as required in the court orders . . . , a transcript of the court proceedings is the only other documentation that will be accepted to verify that these required determinations have been made.").

In short, the magistrate court's ruling from the bench makes it clear why the magistrate judge made the decision to vest custody of the children with the Department. We thus can engage in meaningful judicial review and conclude that there is substantial and competent evidence to support the magistrate court's decision.

**B.      Placing the children in the legal custody of the Department did not violate Father's rights to the custody, care, and control of his children.**

Father argues that the magistrate court's decision to place the children in the legal custody of the Department interfered with Father's fundamental right to the care and custody of his children. While Father acknowledges that the State may have a compelling interest in protecting the children's welfare, Father argues there were less restrictive means to keep the children safe, including the Department's safety plan. The Department responds that, because the magistrate court followed the law, there was no violation of Father's parental rights. We agree with the Department.

"The United States Supreme Court has held that a parent has a fundamental liberty interest in maintaining a relationship with his or her child." *In Int. of Doe*, 164 Idaho 143, 145–46, 426 P.3d 1243, 1245–46 (2018) (quoting *Doe v. State*, 137 Idaho 758, 760, 53 P.3d 341, 343 (2002)). Indeed, the United States Supreme Court has stated that "[t]he liberty interest at issue in this case— the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000).

Father relies on Idaho Code section 32-1013(3) to support his claim that the magistrate court's decision to vest legal custody of the children in the Department violates his fundamental right to parent. Indeed, the Idaho Legislature has highlighted a parent's fundamental rights under this statute, which explains that any restriction or interference with rights protected by the Act

"shall not be upheld unless it demonstrates by clear and convincing evidence that the restriction or interference is both: (a) Essential to further a compelling governmental interest; and (b) The least restrictive means available for the furthering of that compelling governmental interest." Critically, the statute also provides that "[n]othing in this act shall be construed as invalidating the provisions of the child protective act in chapter 16, title 16, Idaho Code, or modify the burden of proof at any stage of proceedings under the child protective act." I.C. § 32-1013(3). Father challenged only the factual findings here, not whether the evidence sustained the required burden of proof under the CPA. Because the Act does not supplant the burden of proof in CPA proceedings, Father's argument for strict scrutiny is inapplicable.

Importantly, "[t]he clear and convincing evidence standard" set forth by this section only applies in termination hearings. *In re Doe*, 156 Idaho 103, 110, 320 P.3d 1262, 1269 (2014). Father's parental rights have not been terminated. Instead, legal custody of Father's children has been temporarily vested in the Department. "[I]n any court decision affecting children, the best interests of the child should be the primary consideration." *Roberts v. Roberts*, 138 Idaho 401, 403–04, 64 P.3d 327, 329–30 (2003); I.C. § 16-1601 ("At all times, the health and safety of the child shall be the primary concern."). While "the state of Idaho shall, to the fullest extent possible, seek to preserve, protect, enhance and reunite the family relationship[,]" the purpose of the Child Protective Act is "the protection of any child whose life, health or welfare is endangered[.]" I.C. § 16-1601. Indeed, the Act authorizes law enforcement and a magistrate court to act quickly when a child's welfare is in question. The magistrate court may vest legal custody in the Department if there is *reasonable cause* to believe it is in the best interests of a child. I.C. § 16-1615(5)(b). In making this determination, the magistrate court may consider "[a]ny evidence . . . which is of the type which reasonable people may rely upon." I.C. § 16-1615(5).

If a magistrate court finds *reasonable cause* to believe a child falls under the jurisdiction of the Act, then an adjudicatory hearing must be held as soon as possible, but no later than thirty days after the CPA petition was filed, to determine whether a child falls under the protections of the Act. I.C. § 16-1615(6). The Act sets forth a "preponderance of the evidence" standard for conducting an adjudicatory hearing:

> If a *preponderance of the evidence* at the adjudicatory hearing shows that the child comes within the court's jurisdiction under this chapter upon the grounds set forth in section 16-1603, Idaho Code, the court shall so decree and in its decree

17

> shall make a finding on the record of the facts and conclusions of law upon which it exercises jurisdiction over the child.

I.C. § 16-1619(4) (emphasis added).

Even when a magistrate court determines by a preponderance of the evidence that a child falls under the jurisdiction of the CPA, the magistrate court does not have to vest custody with the Department. Like was done here, the Act authorizes the magistrate court to "[p]lace the child under the protective supervision of the department for an indeterminate period not to exceed the child's eighteenth birthday . . . ." I.C. § 16-1619(5)(a). When a child is placed under the Department's protective supervision, the child can be removed from the parents' home, but a redisposition hearing must be held within 48 hours. I.C. § 16-1623(3). Redisposition is "based upon facts presented to the court, that the child should be removed from his or her present conditions or surroundings because continuation in such conditions or surroundings would be contrary to the welfare of the child and vesting legal custody in the department . . . would be in the child's best interests." I.C. § 16-1623(1)(b). Redisposition hearings provide the magistrate court the opportunity to exercise broad discretion, while focusing on the best interests of the child. The court may rely on any information relevant to the redisposition of the child in reaching its decision. I.C. § 16-1623(4).

This Court has not previously examined whether removal of the child from his or her home after being placed under the protective supervision of the Department violates a parent's fundamental right to the custody, care, and control of his child. The redisposition hearing process is, in essence, another adjudicatory hearing resulting in a "redisposition" of the child's custody. It is therefore subject to the same "preponderance of the evidence" standard set forth in Idaho Code section 16-1619(4). Importantly, as we have addressed, this is the applicable standard because the parent's custody, care, and control of the children has not yet been terminated. While there are due process protections throughout the process, when the State intervenes to terminate the parent-child relationship the State must prove by clear and convincing evidence that at least one of the statutorily approved grounds for terminating the relationship is satisfied and that termination is in the child's best interest. *Matter of Doe Children*, 164 Idaho 486, 489, 432 P.3d 35, 38 (2018) (citing *In re Doe (2011-02)*, 151 Idaho 356, 362, 256 P.3d 764, 770 (2011)); I.C. § 16-2005(1). Here, however, the State has not terminated the parent-child relationship, and the magistrate court's ruling even reflects it is open to reconsidering its decision if or when circumstances change.

18

For example, after making the decision to vest legal custody with the Department, the magistrate court clarified:

> [M]aybe we can keep this a short turnaround. I'm going to set a hearing in about two weeks. I've got -- it will be a little less than two weeks. It won't be a full-fledged evidentiary hearing like we've had today with all the information and evidence being presented, but why don't we try -- I think we can squeeze it in the 1st before lunch maybe.

Father maintains that the Department's safety plan was a less restrictive alternative to removing the children from the home and the magistrate court violated his fundamental rights by departing from that plan. This argument, however, is unsupported by the record or Idaho Code section 32-1013. The magistrate court had a range of options available when exercising discretion within its outer bounds. *See Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018). As we have already discussed, there was substantial and competent evidence to support the magistrate's determination that the children remaining in Father's custody was not in their best interests and contrary to their welfare. The magistrate court *temporarily* placed the children in the legal custody of the Department to manage visitation and provide a safety monitor for the children during supervised visitation with Father and Mother. In light of the substantial and competent evidence in the record, we hold that there was no unconstitutional interference with Father's parental rights.

## VI. CONCLUSION

The magistrate court's redisposition order is affirmed.

JUSTICES BRODY, STEGNER, MOELLER and ZAHN CONCUR.